# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **D.D.C. Case No. 22-mj-112-RMM** |
| | : | |
| **RODNEY KENNETH MILSTREED,** | : | **(D.Co. Case No. 22-mj-93-MEH)** |
| | : | |
| Defendant. | : | |
| | : | |

## UNITED STATES' SUPPLEMENT TO MOTION FOR EMERGENCY STAY AND FOR REVIEW AND APPEAL OF RELEASE ORDER

On May 27, 2022, the United States filed its Motion for Emergency Stay and for Review and Appeal of the order, entered in the District of Colorado, to release defendant Rodney Milstreed pretrial. Dkt. No. 5. At the time of that filing, the transcript of the detention hearing, held earlier that same day, was not yet available. With this Supplement, the government submits a copy of the transcript. *See* Exhibit B, Transcript of Detention Hearing, D. Colo. Case No. 22-mj-0093 (May 27, 2022).

With this supplement, the government also submits further details about weapons found at Milstreed's Maryland home on May 24, 2022, during a search warrant executed by the FBI. As noted in the government's Motion, agents found a cache of firearms strewn out on a bed in a spare room. Mtn. at 30. But the stash of firearms at Milstreed's home was not limited to just this collection. Agents found firearms in locations throughout the home. And although Milstreed's residence had two large gun safes, the assault weapons and accessories described in the government's Motion were not secured out of reach or safely locked away.[1] Photographs taken

---

[1] Based on information obtained on the day of the search indicating that the safes were used by Milstreed's family members but not by Milstreed himself, agents did not open the safes or inventory their contents.

by agents at the search site are attached. *See* Exhibit 36 (excerpt of photographs taken at Milstreed's Maryland residence during execution of search on May 24, 2022).

Finally, the government submits additional details of the injectable steroids found at Milstreed's Colorado hotel during a simultaneous search warrant executed on May 24, 2022. Among the presumptively controlled substances and paraphernalia found there were vials labeled "British Dragon" Pharmaceuticals-branded Decabal 250 (nandrolone decanoate), trestolone acetate, and Hygetropin human growth hormone. (No testing has yet been performed by federal agents.) Photographs of these seized items are attached. *See* Exhibit 37 (excerpt of photographs taken at Milstreed's Colorado hotel during execution of search on May 24, 2022).

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ *Emily W. Allen*
EMILY W. ALLEN, Cal. Bar No. 234961
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, DC 20530
emily.allen@usdoj.gov
(907) 271-4724

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:22-MJ-00093-MEH-1

_____

AUDIO TRANSCRIPTION OF PROCEEDINGS
May 27, 2022

_____

UNITED STATES OF AMERICA,

Plaintiff,

v.

RODNEY MILSTREED

Defendant.

_____

        Proceedings had on May 27, 2022, at the United

States District Court, Denver, Colorado, held pursuant to

the Federal Rules, commencing at the hour of 10:10 a.m.,

before Magistrate Judge Michael E. Hegarty.

GOVERNMENT
EXHIBIT

**Exhibit B**

```
 1                    A P P E A R A N C E S

 2    For the Plaintiff:            TIM R. NEFF, ESQ.
                                    U.S. Attorney's Office
 3                                  1801 California Street
                                    Suite 1600
 4                                  Denver, Colorado  80202

 5    For the Defendant:            MATTHEW KYLE BELCHER, ESQ.
                                    Office of the Federal
 6                                  Public Defender
                                    633 17th Street
 7                                  Suite 1000
                                    Denver, Colorado  80202

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            (This begins the audio transcript of
 3    proceedings)
 4            THE COURT:  Case Number 22-MJ-93, United States
 5    of America versus Rodney Milstreed.
 6            MR. NEFF:  Good morning again, Your Honor.  Tim
 7    Neff on behalf of the government.
 8            MR. BELCHER:  And Matt Belcher again on behalf
 9    of Mr. Milstreed, who's in custody and furthest from the
10    bench in the jury box.
11            THE COURT:  Thank you.
12            Good morning, Mr. Milstreed.
13            All right.  So waving ID?
14            MR. BELCHER:  That's correct, Your Honor.
15            THE COURT:  Okay.  And contesting detention?
16            MR. BELCHER:  That is correct.
17            THE COURT:  Very good.
18            It's not a presumption, is it?
19            MR. NEFF:  No, it is not, Your Honor.
20            THE COURT:  Okay.  Mr. Neff.
21            MR. NEFF:  Thank you, Your Honor.
22            THE COURT:  You want me to put this -- do you
23    want me to be looking at something while you're having your
24    argument?
25            MR. NEFF:  I don't believe so, Your Honor.  I
```

1    -- I apologize to the Court and Mr. Belcher kind of for

2    getting all that material over yesterday, only in the sense

3    -- just the volume was a lot.  So I don't --

4          THE COURT:  I've never even seen something like

5    this.  What is it?

6          MR. NEFF:  Right.  Well, that, actually --

7    believe it or not, that would be the -- a thumb drive where

8    the video that's referenced in the memo could be viewed, if

9    the Court was so inclined.  It's --

10          THE COURT:  Right.  But I have something that

11   can play this?

12          MR. NEFF:  Actually, you do.  I had the same

13   problem.  You actually can flip it, and it's a -- it's a

14   thumb drive.  I could show the Court.  But if the Court,

15   you know, wants to take a look at --

16          THE COURT:  Oh, no.  I got it.  That's the

17   thumb drive?

18          MR. NEFF:  That's the thumb drive, right.  And

19   then you would just plug it in and review it.

20          Because of the length of those videos, it's not

21   conventional.  I guess conventional media is what it is.

22          THE COURT:  Does it go into a USB?

23          MR. NEFF:  Yes.  A USB port should do that.

24          Were you able to see that?  Did you see them?

25          MR. BELCHER:  Yeah.  [Inaudible] UBS or

```
 1    whatever.
 2              MR. NEFF:  Oh, so you didn't have that?  Yeah.
 3              MR. BELCHER:  First, when I got one of those
 4    cards from your office, I was a little perplexed.
 5              MR. NEFF:  Right.  To help the Court, right.  I
 6    had to get technical help to figure out what was going on
 7    with it.
 8              THE COURT:  Have you seen those?
 9              MR. BELCHER:  I have, Your Honor.  They
10    provided them to me via the Cloud.
11              THE COURT:  No, no, no, no, no.  I mean, have
12    you seen this kind of device?
13              MR. BELCHER:  Yes, I have.
14              THE COURT:  Okay.  So I have those teed up, if
15    you want me to look at them.
16              MR. NEFF:  Okay.  At the -- at the right time,
17    it may be appropriate, Your Honor.
18              THE COURT:  All right.
19              MR. NEFF:  If the Court -- okay.
20              So at the outset I recognize, Your Honor,
21    pretrial services has recommended release.  The detention
22    prong that the government is solely basing its request for
23    detention on is danger to the community, just so it's clear
24    for everyone.  That's the -- the prong that we are
25    asserting the Defendant should be detained under.
```

```
 1              Obviously, the memorandum and proffer that was
 2     submitted to the Court was very extensive and has a lot of
 3     supporting documentation and so forth, but I'd like to
 4     highlight several points from there as part of my argument.
 5              The Defendant -- the government submits the
 6     Defendant --
 7              THE COURT:  You said "memorandum."  You mean
 8     the --
 9              MR. NEFF:  It's a --
10              THE COURT:  Don't you mean the criminal
11     complaint?  Is that what you're talking about?
12              MR. NEFF:  Well, did the Court -- the Court --
13     did the Court see the -- I should have asked, did the Court
14     see the government's -- there's a 40-page, 39-page
15     memorandum and proffer in support of pretrial detention.
16              Has the Court seen that?
17              THE CLERK:  We don't have that, Your Honor.
18              MR. NEFF:  Sorry?
19              THE CLERK:  We don't have that.
20              MR. NEFF:  We don't have it.  Okay.  Well,
21     that's pretty critical to the government's position.
22              THE COURT:  Yeah.  Why don't we find it.  I
23     want -- I want to give you your opportunity.
24              MR. NEFF:  Right.
25              THE COURT:  When did you submit it?
```

```
1              MR. NEFF:  I think it was just submitted.  It
2     was filed, I believe, just the --
3              THE COURT:  On the docket?
4              MR. NEFF:  Yep.  Yes, Your Honor, I believe so.
5     Let me double-check.
6              Yeah.  That's -- Mr. Belcher got it.  It's --
7     I'm just double checking the number for it, the docket
8     number.  There should be a very short docket listing.  I
9     think it may be seven maybe.
10             THE CLERK:  It is Docket Number 7, Your Honor,
11    would you like it?  I have a copy.
12             THE COURT:  I would, yeah.
13             I was not informed that that was filed.
14             MR. NEFF:  So --
15             THE COURT:  Go ahead.
16             MR. NEFF:  Your Honor, it's pretty detailed and
17    comprehensive.  And, obviously, the Court hasn't had the
18    benefit of it.  So to the extent the Court --
19             THE COURT:  Mr. Neff, during criminal, we learn
20    to look at things --
21             MR. NEFF:  Okay.
22             THE COURT:  -- on the spot, so I'm -- I'm good.
23             MR. NEFF:  Okay.
24             THE COURT:  Let's -- let's do it.
25             MR. NEFF:  I'm not going to suggest the Court
```

1  can't digest all this as we argue and discuss things, but

2  to the extent -- it's a way of overview.  It's a very

3  detailed memorandum and proffer that outlines the

4  underlying factual basis in support of detention in this

5  case.

6          As the Court would review it -- and I'll point

7  out some things right here that are contained in there.

8  Here's why we think the Defendant is a danger to the

9  community.

10         First, the first portion of the memo talks about

11  -- this -- this all revolves around, obviously, the January

12  6th Capitol incident in 2021 that most people are familiar

13  with, and it relates to the Defendant's role and

14  participation in that.  That's the genesis or basis of the

15  charges that he's held on the complaint for.

16         As outlined in the report, the heading at --

17  into the January 6th date, shortly after the election was

18  held, the Defendant started posting and indicating to

19  friends and other people on Facebook that he was taking

20  steroids.  He was starting to take steroids so he could

21  jack himself up in anticipation in the coming protest or

22  rally that would be at the Capitol.

23         You'll see in there that he clearly was agitated

24  and upset, like a number of Americans were, with the

25  election results, which certainly is their First Amendment

```
1    right, and they're entitled to that, but this --
2              THE COURT:  Maybe not the result so much as the
3    process.
4              MR. NEFF:  The process I should say, right, the
5    process.
6              THE COURT:  What they viewed to be cheating.
7              MR. NEFF:  Sure.
8              THE COURT:  Okay.
9              MR. NEFF:  Sure.  Yeah.  Understood,
10   understood.
11             And heading up to the protest, he -- you'll see
12   from the memo and the proffer, he decided -- he made it
13   clear he was going to go up there and become involved in
14   the protest.
15             And you'll see from his communications that he
16   stated a number of things that indicated his intent was to
17   be violent, if necessary.  Some of the things he indicated,
18   It's going to get ugly when they overturn this vote.  Can't
19   walk away from this stuff.  He made references to upcoming
20   civil war and the fact that they were going to have to
21   punish the people responsible for this and drag some of
22   them into the streets around the Capitol.
23             In anticipation of going up there, he made it
24   clear he was going to take steroids to jack himself up.  He
25   also indicated that he was going to take a flagpole, which
```

```
 1   he later references as his club, to the scene.  And he also
 2   sent pictures to a number of people he associated with
 3   online showing guns and ammunition in his residence.
 4           THE COURT:  Have these all been -- did any
 5   search or warrant obtain these?
 6           MR. NEFF:  Right.  So what you'll see, at the
 7   end of the memo, the AUSA who's detailed and assigned to it
 8   in Washington, D.C., did put -- towards the very back,
 9   there's, like, the fourth section of the memorandum where
10   you'll see the results of the search.
11           THE COURT:  I see it.  It's 32 to 33.
12           MR. NEFF:  Right.
13           And so it outlines -- I was going to get to
14   that, but you'll see there were things found in his house
15   that corroborated what was seen online with the postings
16   and pictures with the firearms and ammunition.  That was
17   all found in his residence when they just did the search.
18   I believe it was last week in Maryland, is where his
19   residence is.
20           As the Court knows, he's out here currently
21   working on a job site.
22           THE COURT:  So some of these would be ghost
23   guns?
24           MR. NEFF:  I believe that would be a term for
25   them, right.  Many of them did not have serial numbers on
```

```
1   them.  They appear to be component three parts as well.
2   And I can get to that in a minute.
3           But my -- I guess my point is:  I go through the
4   sequence of events.  He made it clear to people that he had
5   these in his position -- possession and was prepared to use
6   them.
7           But it's notable he didn't take these.  There
8   was no indication he was armed with any firearms or
9   ammunition on the day of the events.
10          THE COURT:  And none of them on their own are
11   illegal in the possession of an otherwise lawfully --
12   lawful person?
13          MR. NEFF:  Well, that's a good question.
14   That's still under review and investigation.  I'd point out
15   the pretrial services report indicates that the Defendant
16   has been convicted of a felony, so he is not allowed to
17   possess ammunition.
18          That's the -- the pre-sentence report does
19   indicate he has a felony conviction, albeit old.  It's from
20   1988.  Federal law puts no limitation on the time period an
21   individual --
22          THE COURT:  So you have to get your rights
23   restored in some way --
24          MR. NEFF:  Right.
25          THE COURT:  -- regardless of the age of the
```

```
 1   felony?
 2             MR. NEFF:  He would.  And there's no indication
 3   he's had them restored.  And, further, I'm not sure if
 4   federal has the ability to restore your federal rights
 5   short of some type of a full presidential pardon.  I think
 6   it's often under state law that people can have their civil
 7   rights restored, but I don't think federally there really
 8   is a mechanism to do that.
 9             But, right.  So the point -- the point is
10   there's -- that's --
11             THE COURT:  CDS.
12             MR. NEFF:  I believe -- I don't know exactly
13   what that stands for.  I honestly don't.  I had the same
14   question.  Distribute -- it did say that, possession with
15   intent to distribute CDS felony.
16             THE COURT:  Well, CS would be -- could be
17   controlled substance.
18             MR. NEFF:  Substance.  Control or distribution.
19   I don't -- actually, I don't know.
20             THE COURT:  Right.
21             MR. NEFF:  I don't want to guess.  I don't
22   know.
23             So the point -- the point is:  It appears that
24   he is a convicted felon.  He had no right to possess --
25   certainly the ammunition is a violation in itself, and
```

```
 1    whether apparent firearms or component of firearms.
 2              I mean, the federal statute does define, as a
 3    firearm, as long as we're on that topic, the frame or
 4    receiver of any such weapon.  That in itself can mean a
 5    firearm, pursuant to 921(a)(3).  That meets the statutory
 6    definition.  I don't believe it has to be fireable or be
 7    able to discharge a bullet.  By definition, a frame or
 8    receiver would constitute a firearm, and it appears he has
 9    a number of them.  Again, that's 921(a)(3).
10              THE COURT:  Gotcha.
11              MR. NEFF:  So -- so then he goes to the Capitol,
12    Your Honor.  And you can see what the video is.  We
13    actually have the video of some of his activity that day at
14    the Capitol.  Why he's charged with the assault on a
15    federal officer, the Court can look at it.  I saw it.  I'm
16    sure Mr. Belcher has.  It is disturbing.  Frankly, I've
17    never seen any footage from the -- really the incident.
18              But for -- for what it's worth, he has a -- he
19    takes a flagpole.  He's seen walking up there with his
20    flagpole.  And he's in the crowd, and he's at the line
21    outside the Capitol.  And the Court can --
22              THE COURT:  Are you referring to a specific
23    video?  I have -- I have --
24              MR. NEFF:  Eighteen, eighteen.  I believe it's
25    eighteen, Your Honor.  If the Court takes a look at 18.
```

1    And it goes to about -- if you go to about 30 seconds into

2    it, you'll see an incident where the crowd is -- there's

3    blood spilled.  It's on the Capitol ground.  There's a line

4    of police officers in full riot gear, and there's the

5    crowd, who's agitated and protesting, and the Defendant is

6    in the middle of it.

7              THE COURT:  I'll stop at 13, if you can -- or

8    30, you said, right?

9              MR. NEFF:  Around 30 seconds, I think.

10             THE COURT:  In the frame, where is

11   Mr. Milstreed?

12             MR. NEFF:  I think, to identify him, just run

13   it through about 35.  When you see a flagpole go flying and

14   hit the frontline officers of the Capitol, the individual

15   throwing it, there he is.  He's the one throwing the

16   flagpole.  I describe it kind of like a javelin or spear.

17   I know it wasn't pointed.

18             THE COURT:  Does it have a flag?

19             MR. NEFF:  It has a flag.  Yep.

20             THE COURT:  What's the flag?

21             MR. NEFF:  I -- I don't know for certain.

22   There is a picture of it.  I'm not sure what it was.

23             MR. BELCHER:  Looked like a Trump -- it looked

24   like a Trump flag to me, Your Honor.

25             THE COURT:  All right.  Hold on.

```
 1                   MR. BELCHER:  I know they describe it as a navy
 2      blind, but it doesn't look like.
 3                   MR. NEFF:  Okay.
 4                   THE COURT:  A blue hat, blue ball hat?
 5                   MR. NEFF:  I believe so.  Let me take a --
 6                   MR. BELCHER:  Camouflage hoodie.
 7                   MR. NEFF:  Right, camouflage.
 8                   MR. BELCHER:  I'm kind of blind, Your Honor, so
 9      I'm not going to --
10                   THE COURT:  Are you really?
11                   MR. BELCHER:  -- jump out on a limb there.
12                   MR. NEFF:  Just double -- yeah.  It's a
13      camouflage jacket.
14                   And there's a lot going on in that video as the
15      -- yes, blue ball cap.  Yes, I have that.
16                   THE COURT:  On the other side is the cameras.
17      I got it.
18                   MR. NEFF:  Okay.  You'll see a projectile,
19      which is the flag that -- okay.
20                   So, you know, that -- okay.  That's the
21      incident.  That's one of the key incidents in this case.
22      You know, it didn't get -- the manner in which it was
23      thrown, I submit, was similar to like a spear, because it
24      directly deflected off of the helmet and face shield,
25      fortunately for the officers, and then nobody apparently
```

```
 1    was -- was injured, as best I know, but it could have
 2    potentially resulted in some serious bodily injury.
 3              If the Court goes through the memo, you'll also
 4    see that wasn't the only conduct he engaged in that day
 5    that was violent.
 6              There was another instance when there was a
 7    photographer from the AP, who was on the steps, and the
 8    crowd began to yell or suggest this might have been a
 9    member of Antifa.  And the Defendant was one of the first
10    to assault him, grabbing this reporter by the backpack and
11    yanking and pulling him down on the stairs.
12              THE COURT:  Is that recorded?
13              MR. NEFF:  I believe -- yes, it is.  And the
14    memo will show you pictures, actually.  If you look at the
15    picture, page 24, you can see Mr. Milstreed actually
16    grabbing that reporter right there.  You can see the camera
17    in the hands of the reporter, and that's right before the
18    reporter was yanked down to the ground.
19              THE COURT:  And what -- what video is that?
20              MR. NEFF:  I don't know if there's a video of
21    that, Your Honor.  I didn't see a video of that
22    particular --
23              THE COURT:  That's fine.
24              MR. NEFF:  I don't believe we included that as
25    a still frame.
```

1          THE COURT:  Okay.

2          MR. NEFF:  So that's that incident.  There's

3    also -- you'll see a couple pages before on, page 21, there

4    was a smoke grenade thrown by the officers to try to repel

5    the crowd and disperse the crowd, and Mr. Milstreed appears

6    to pick it up and throw it back towards the line of

7    officers.

8          Among other things, when he was at the Capitol

9    grounds, he was posting various things on Facebook and

10   social media, such as, "Let's get them," "Let's make

11   history," "We're going to take the building," "I feel so

12   alive during the assault."

13         Shortly after they had a skirmish with the

14   officers, he said, "We F'd them federal cops up.  They all

15   ran when we got physical LMFAO."  Obviously a reference to

16   him laughing about it.

17         So that's the kind of language and just the kind

18   of mindset, obviously, that the government presents to

19   suggest this was something he intended to do.  He went up

20   there with intent to create havoc, gets in the middle of

21   this, and, in fact, we submit did assault a police officer,

22   and a civilian there in that.

23         THE COURT:  So he's been free since --

24         MR. NEFF:  Correct?

25         THE COURT:  -- January 6th of 2021?

```
 1              MR. NEFF:  Right.

 2              THE COURT:  Is there a proffer as to anything

 3    he's done against the law or of a threatening nature during

 4    that time period?

 5              MR. NEFF:  Since that time frame.  I asked that

 6    very specific question, because I figured the Court would

 7    ask, and the answer is I'm not aware of anything, and the

 8    agent I just talked to said she was not aware of anything.

 9    So the answer would be no.

10              They learned about -- one other point is they

11    just -- they got an important piece of information --I

12    believe it was around January of this year -- as to his

13    actual identity.  So that's partly to explain why he wasn't

14    arrested or identified -- he wasn't able to be identified

15    earlier.

16              So he really was first identified about a year

17    after the incident, and then the agents did work

18    aggressively and quickly as they could to pull this

19    together to make a case on Mr. Milstreed.  But that does

20    explain in part why there was a gap where nothing happened

21    with him.  But that's just by way of background.  Just a

22    couple more points, Your Honor.

23              After the incident happened, as outlined in the

24    memo, the Defendant made a number of additional comments

25    that indicate this clearly was his intent to have engaged
```

```
 1    in this behavior and that he potentially wasn't going to
 2    stop.  He's quoted telling other people afterwards,
 3    "I'm home.  What a blast.  We got their attention.  These
 4    federal cops were no match for angry Americans.  I" -- it's
 5    a typo, but he says, "I make a charge for" -- I believe
 6    it's, I may get charged for punching the camera guy, but it
 7    was worth it.  Words of that effect.  It's outlined in the
 8    memo.
 9            The point being, he wasn't remorseful,
10    certainly, after he returned from the Capitol, and he
11    seemed to revel in the fact that he had been involved in
12    this, you know, ugly incident.
13            So then, finally, I just phase into -- the Court
14    started with this, but recently, when he was arrested, it
15    appears he is still using steroids, which would be a
16    controlled substance.  There's been no federal charges
17    filed for that.  And there --
18            THE COURT:  I'm more concerned about the
19    spotted history of other substances than I am about
20    steroids, about heroin and about cocaine.
21            MR. NEFF:  Right.  Well, he definitely has a
22    history with the cocaine, and he's been -- he referenced --
23    you'll see in the memo, shortly after the incident, he
24    commented to one of his friends, to quote him in one of the
25    Facebook threads, he said -- I'll give the Court the exact
```

```
 1   quote.
 2              "These MF'ers don't want me to start doing
 3   cocaine again, son."
 4              THE COURT:  Yeah.  And that's -- that's an
 5   interesting comment because, as you see in the pretrial
 6   services report, he claims to have been free for 25 years.
 7   So it definitely refers to sometime in the past.
 8              I'm -- I guess it's been less than 25 years
 9   since he picked up a charge of possession of heroin and
10   possession of a controlled substance.  2006, for which he
11   pled guilty.
12              MR. NEFF:  Right.
13              THE COURT:  But we don't know anything about
14   what that substance is.  Possession of a controlled
15   substance in 2008, but no disposition on that.
16              MR. NEFF:  Right.  And we -- all we can do is
17   kind of connect the lines.  But, right, it's limited
18   information.  Some data points.
19              But certainly there is a prior history of
20   controlled substance, either use or distribution.  He does
21   make that reference that perhaps he had previously used
22   cocaine.  And, right, I think that's a valid point, and
23   that's one of the government's concern.  Again, a volatile
24   mix, obviously, would be a person using any kind of
25   stimulant like that or addictive substance.
```

```
 1              And I wouldn't diminish the steroid use, Your
 2    Honor, because, frankly, he said the sole purpose for using
 3    those steroids before the incident was so he could get
 4    jacked up before he went up there.
 5              THE COURT:  But the steroids, do they impact
 6    your psyche or just your body?
 7              MR. NEFF:  Well, I certainly think we've all
 8    heard of roid rage.  I think that's -- there's some
 9    foundation for that, the idea that individual takes
10    steroids in is pumped up on a lot of --
11              THE COURT:  Yeah.  I don't know the science,
12    though, Mr. Neff, honestly.
13              MR. NEFF:  I can't either.  I can't speak to
14    that.  I'm just going from what you hear.  And I think it's
15    a well-established fact that perhaps abuse, steroid abuse,
16    one potential side effect is aggression for people.  But
17    that's about all I'm saying.  I don't want to go out on a
18    limb on that too far.
19              THE COURT:  Understood.
20              MR. NEFF:  But -- but the point is he still had
21    -- he apparently still has all these steroids in the hotel
22    room.  94 vials to be exact.  They haven't been tested
23    yet, but they do appear to be steroids.
24              So one might ask himself, what -- is he
25    preparing for something else, or why is he continuing to
```

```
 1    use these?  Does he have something else planned?  Don't
 2    know, certainly.
 3              So what this boils down to, Your Honor --
 4              THE COURT:  At some age?
 5              MR. NEFF:  Pardon me?
 6              THE COURT:  At some age, I promise you,
 7    steroids are not going to make much of an impact on your
 8    body.
 9              MR. NEFF:  Okay.
10              THE COURT:  I mean, it's the difference between
11    a 56-year-old and a 20-year-old.
12              MR. NEFF:  Certainly.
13              THE COURT:  Believe me on that.
14              MR. NEFF:  I would agree.  Sure.  I'm sure his
15    -- yeah.  Being a person at 56 years of age, I'd probably
16    agree with that.  Sure.
17              So I'll just -- I'll conclude.  I don't want to
18    keep droning on.
19              So the government's underlying concern and
20    biggest focus, we do -- we do contend that the Defendant
21    presents a safety threat to the community.  In this
22    instance, he -- although he doesn't have a history of
23    violence conceded, he was very riled up about, obviously,
24    the election, and he had a stated intent right after the
25    election to make this ugly effectively, and he followed
```

```
 1    through with it.
 2            And -- and I just went through the details that
 3    suggested he was violent and would act on his impulses.  He
 4    got upset and angered, and he, apparently, did some
 5    assaulting that day at the Capitol.
 6            Obviously, the government's concern is the fact
 7    that he -- that day he took a flagpole and used his fist,
 8    but he has a bunch of ammunition and firearms at his house
 9    that he shares with other people to suggest that those
10    might be used if necessary.
11            THE COURT:  Well, he wouldn't, of course, if he
12    was released on conditions.
13            MR. NEFF:  Right.  Well, that's true, but I
14    think we all recognize people, even if they're released, if
15    they have the desire -- where there's a will, there's a
16    way.  He's a machinist.  That's what he does.  He certainly
17    probably has the capability or knowledge how to make his
18    own firearms.  That's certainly not unheard of the, quote,
19    reference ghost guns.  That's something within his homemade
20    talent.
21            So the point is -- and I'll end on this -- the
22    government believes and submits this man does present a
23    risk based on his conduct in this case and his apparent
24    volatility combining with some of his, perhaps, substance
25    abuse issues, and we asked that he'd be detained.
```

1          THE COURT:  Thank you, Mr. Neff.

2          MR. NEFF:  Thank you.

3          MR. BELCHER:  Thank you, Your Honor.

4          In preparing for the hearing today, I was

5     researching, making sure what the burden of proof is on a

6     danger, which is clear and convincing evidence.

7          But in doing so, Your Honor, I came across a

8     case that had an interesting quote that I think would be

9     good to start with.  And it's a Western District of

10    Missouri case, noting that, "There is a small but

11    identifiable group of a particularly dangerous set of

12    defendants as to whom neither the imposition of stringent

13    release conditions, nor the prospect of release, can ever

14    reasonably assure the safety of the community."

15         Mr. Milstreed is not part of that small

16    identifiable group, Your Honor.

17         THE COURT:  No.  I need to address with both of

18    you where I am on this so you can focus your comments.

19         MR. BELCHER:  Sure.

20         THE COURT:  I will detain in a second someone

21    who I believe is in an active cycle of violence.

22         MR. BELCHER:  Right.

23         THE COURT:  Like, if I release them, they're

24    going to have a gun in ten minutes because spotted

25    throughout their record is their possession of a firearm.

```
 1    And I know, to a reasonable degree of certainty, that
 2    they're going to pick up a gun --
 3              MR. BELCHER:  Understood.
 4              THE COURT:  -- of what they tell me in court.
 5    Right?  And those people are going to be detained.  Those
 6    people typically have three or four or five felonies,
 7    drugs, guns, maybe a prior 922(g), gang affiliation, and in
 8    this offense they were caught with one in their waist, 15
 9    rounds, and a magazine and a round in the chamber.  Those
10    people I'm concerned about.
11              The concern here is just not that, not that he's
12    the kind of person that is out with a gun at all times.  So
13    I'm not worried about that.  And I would -- Mr. Neff, I was
14    going to ask that question.
15              Many people make monumental mistakes in their
16    life.  They may regret it, they may not, but they do at
17    least see it was a mistake.  And, you know, that I would
18    need to be convinced of a little bit here, that
19    Mr. Milstreed, probably in hindsight, believes he made a
20    mistake.
21              MR. BELCHER:  Very much so, Your Honor.
22              THE COURT:  If he believes that he acted
23    righteously, then there may be very soon some other
24    triggering event at any moment, actually, in this country,
25    given how we politicize everything, that would set that
```

```
 1    kind of a mind off.  Agreed?
 2              MR. BELCHER:  Agreed.
 3              THE COURT:  So, you know, there's going to be
 4    no end of politically aggravating occurrences for either
 5    side of the aisle.
 6              And so I would have to -- I mean, I would want
 7    to hear some information that, you know, unlike the rest of
 8    us, when we get angry, we know how to diffuse that and
 9    remain within societal norms.  And Mr. Milstreed clearly
10    did not -- based on at least the evidence presented, he got
11    carried away with a mob.  No doubt about that.
12              MR. BELCHER:  Right.
13              THE COURT:  And that does happen.  I mean, I
14    had an Olympic gold medalist in this courtroom.
15              MR. BELCHER:  A very tall individual standing
16    in the rotunda.
17              THE COURT:  Two months ago.  Olympic gold
18    medalist.
19              MR. BELCHER:  Uh-huh.
20              THE COURT:  And to get there, you would have
21    had to spend a good part of your life from four or five on
22    doing nothing but that.
23              MR. BELCHER:  Right.
24              THE COURT:  With a dedication, a focus, a
25    commitment, and he got caught up and was so stupid as to
```

```
 1   wear his Olympic jacket --

 2              MR. BELCHER:  Right.

 3              THE COURT:  -- to it, to this thing.  So I get

 4   it.

 5              Any -- have these cases been disposed of yet,

 6   Mr. Neff?  Do you have any idea?

 7              MR. NEFF:  Just what I've read in the press.  I

 8   can't be very specific, Your Honor.  You mean in terms

 9   of --

10              THE COURT:  Have there been some dispositions?

11              MR. NEFF:  Certainly there has been.  There's

12   been --

13              THE COURT:  Any trials?

14              MR. NEFF:  I think there's been some trials.

15   There's been -- there have been some acquittals, I believe,

16   or dismissals maybe by the Court.  There's been some

17   convictions, and there's been some pleas.  So it kind of

18   runs the gambit.

19              THE COURT:  Any -- any concept of how people

20   have been charged?

21              MR. BELCHER:  Close to 800, I want to say, Your

22   Honor.  750 to 800 individuals have been charged.

23              THE COURT:  Okay.  Yeah.  Okay.

24              So -- so I think, you know where I'm at -- I am

25   on that.  I don't see that evidence of us being -- him
```

```
 1    being caught in either a culture, you know, an
 2    acquaintance, group, or a situation where violence could
 3    happen in any moment.  I see somebody who just was out of
 4    his mind, upset about something that was dear to all of us,
 5    and that's the sanctity of a presidential election because,
 6    if we lose the ability to have one -- our vote count, then
 7    what do we have left in this country, right?
 8                MR. BELCHER:  Right.  And a lot of people were
 9    upset, and I agree with the Court that some people handled
10    it differently than others.  But I think the telling sign
11    here, Your Honor, is not only something that the Court
12    touched upon earlier when asking about what's been going on
13    the past 16 months.  So a temporal proximity type of
14    analysis, but also history.
15                And I think, when you look at something in
16    isolation, as the government's argument on detention solely
17    -- well, I'd say 99.8 percent of it rests on the actions of
18    Mr. Milstreed that day.
19                But if you look in his past, he has no history
20    of violence whatsoever.  And despite the government's
21    argument, in their memorandum or offer proof, that he's a
22    danger, as he sits here today, we have 16 months where
23    nothing else has happened.
24                In fact, the large amount of exhibits given to
25    me yesterday about his Facebook posts stop at January 10th.
```

```
 1    There's no indication that he's continued on this rant.

 2    There's no indication that he's continued to plot the

 3    demise of our country or to take over the Capitol or to go

 4    to any other protests.

 5              THE COURT:  Is there any indication that -- you

 6    know, was there any indication of that before the election,

 7    any kind of, that kind of social media activity?

 8              MR. BELCHER:  There appears to be statements

 9    after the election leading --

10              THE COURT:  Before the election?

11              MR. BELCHER:  I don't know if I was provided

12    that.

13              THE COURT:  Mr. Neff, do you know anything

14    about -- of a social media nature before the election?

15              MR. NEFF:  I have no knowledge about any of

16    his --

17              THE COURT:  Okay.

18              MR. NEFF:  -- activity before the election.

19              MR. BELCHER:  I don't either, Your Honor.

20              But, I guess, my point, Your Honor, is going

21    along how the Court analyzes when individuals are going to

22    be in possession of a gun or your concern that they're

23    going to go out and grab one, the concern here would be

24    trying to assess, based on his personal history,

25    characteristics, his prior criminal history, and his
```

```
1   actions 16 months after the January 6th event, whether or
2   not he's likely to go do this again, and my answer to the
3   Court is no.  I don't see any evidence of this happening in
4   the past, and I don't see any evidence of him continuing in
5   this behavior post January 6th.
6           In fact, it appears that he stopped Facebook,
7   social media, commenting on it around January 10th.  So
8   four days after the event, and there hasn't been any since.
9   He went back to his employment.  He's been working here for
10  two and a half years.
11          I should have asked, Your Honor, did the Court
12  receive the letters that I provided on his behalf?
13          THE COURT:  Yes.
14          MR. NEFF:  His father; his current girlfriend,
15  Valerie; and then his current boss, who I can tell you is
16  well aware of the arrest, is aware of the allegations, and
17  what the arrests are for, and despite that provided that
18  letter to the Court detailing what I believe to be Mr.
19  Milstreed's true character and not the aberrational
20  character that we saw on the videos and the allegations
21  from January 6th.
22          I think this election -- what happened around
23  January 6th, there's a good 75 million people that were
24  upset with the results of this election.  There were
25  thousands, if not more, people that went to that rally that
```

```
 1   day.  I think -- I think, unfortunately, they whipped each
 2   other up into a fervor, and I think Mr. Milstreed -- I
 3   don't know if this is a quote -- knucklehead, but it was
 4   bonehead, knucklehead, or some reference to that.  When I
 5   spoke to him about the events that day, he clearly realizes
 6   that his behavior that day, regardless of his beliefs of
 7   whether or not the election was fraudulent or not, was not
 8   acceptable.  He's embarrassed about it.  It's never
 9   happened before in his past, and it hasn't happened since.
10           He went back to work.  He's been out here in
11   Brighton, living in a hotel room, working as a machinist,
12   doing Valtech work.  He has not engaged in any additional
13   violence whatsoever.  Doesn't intend to.
14           I believe the Court and the government and
15   everyone is aware that there was another, albeit more
16   subdued and less attended, rally at the Capitol on January
17   6th of this year.  Mr. Milstreed does not appear to have
18   attended that or in any other way advanced in any belief
19   that he should take action to stop the steal, so to speak.
20           And so I believe the question for the Court
21   today is whether Mr. Milstreed, as he sits here in this
22   courtroom, poses a danger to the community and such a --
23   such a danger that not even stringent conditions can
24   alleviate it.  And I would say to the Court, I don't
25   believe, as he sits here today, he poses a danger to the
```

```
 1   community, and certainly not a danger that can't be

 2   alleviated.

 3              As to the government's concerns as to steroids,

 4   those would be illegal substances that he would not be

 5   allowed to take.  The conditions recommended by probation

 6   for bond include prohibition of taking any controlled

 7   substances and testing to ensure that he is not.

 8              So to the extent the government is arguing that

 9   his continued steroid use could pose a danger to the

10   community, that would be alleviated by the conditions that

11   can be set by this Court to prevent him from doing so from

12   this point further.

13              Furthermore, it appears that Mr. Milstreed will

14   be staying here.  He won't be returning to his residence in

15   Maryland.  He would be staying here.  I spoke with his

16   employer.

17              Understandably, they wanted to wait to see what

18   the Court ordered in this respect, but should the Court

19   order his release on bond they're prepared to provide him

20   with a hotel room for him to reside in and to pay for it

21   per his contract with ISS to continue working here in

22   Brighton.

23              THE COURT:  Where does he reside right now?

24              MR. BELCHER:  In a hotel provided by his

25   employer.
```

```
 1              THE COURT:  So he has the full time he's
 2    been here?
 3              MR. BELCHER:  Yes.  He has a residence in
 4    Maryland, Your Honor, but he has been living here, for the
 5    most part.
 6              He occasionally goes home, visits family.  As
 7    you can see, he helps take care of an elderly father that
 8    -- whose house he lives in.  Has a girlfriend, you know.
 9    Has ties to the community.  He's lived there for 20 years,
10    I believe, in that same residence.  So he does return.
11    Obviously, here he would have to get permission to return
12    for those types of visits.  But he lives in a hotel room
13    provided by his employer.
14              THE COURT:  Well, I'm not sure the geographical
15    restriction would be particularly relevant in a situation
16    like this, at least with regard to travel between here and,
17    virtually, the district where it's being prosecuted.
18              MR. BELCHER:  Right.
19              THE COURT:  That wouldn't be much of an issue
20    for me.
21              MR. BELCHER:  Yeah.  Just -- it would be --
22    typically the standard condition is you reside in the State
23    and District of Colorado, and you can get permission to
24    leave.
25              THE COURT:  Right.  But Mr. Neff is not relying
```

1    on a risk of nonappearance.

2            MR. BELCHER:  Right.  No, I agree with that,

3    Your Honor, and I don't believe there's any evidence of it.

4    I think there was a failure to appear 23 years ago on a

5    fishing ticket that he forgot to pay, but other than that,

6    I think Mr. Milstreed is not going anywhere.

7            And as it concerns the specific argument of the

8    government, while I understand their reliance on the nature

9    of the offense and allegations that day, I think every

10   other 3142(g) factor warrants release on the conditions,

11   and I believe that he does not pose any danger to the

12   society at this moment.

13           Thank you, Your Honor.  Thank you,

14           THE COURT:  Thank you.

15           Mr. Neff, did you want to wrap up?

16           MR. NEFF:  Certainly.

17           I recognize the record is devoid of really much

18   evidence post event, but I still think the Court can and

19   has a basis to detain based on the underlying conduct and

20   the comments of the Defendant.  I'll just leave the Court

21   with some of the comments of the Defendant three days after

22   the event.

23           "People want blood, and I'm one of them.  We are

24   at war.  It's just cold at the moment.  Anybody that thinks

25   I went to hold a sign and say stop the steal is foolish.  I

```
1    went to crack some heads.  I think it is time for the use
2    of the Second Amendment and what is designed for these.
3    These F's need to be dragged out on Constitution Boulevard
4    and hung.  I'm not even sorry people got hurt.  Could have
5    been me.  This is what happens in time with war.  Martial
6    law needs to be enacted."
7              I understand he hasn't done anything since that
8    time, but the concern is this man still thinks in his head
9    we are at war or there's an event in our community that
10   suggests in his mind that we are at war, he appears willing
11   to act, and we know what he does when he gets -- acts, and
12   that's violence.
13             So that's the government's concern, and that's
14   why we've asked for detention.
15             THE COURT:  Understood.  Thank you, Mr. Neff.
16             And if there was a propensity, I would agree
17   with you.  I don't see a propensity here.  I see a single,
18   very severe incident, the strength of which is very strong.
19             And, by the way, what I think is fairly relevant
20   to me deciding this is I actually have a son who went out
21   to the Capitol two weeks after that and protected the
22   United States Capitol during the inauguration in full
23   battle gear.  My son did that, and I'm still not that
24   concerned on danger, even though my son could well have
25   been one of those people he was lashing out at.  So -- and
```

1    my son is a federal law enforcement officer, and I'm proud

2    of that.

3            I don't see a fundamental basis in the record to

4    disagree with the recommendation of the U.S. Pretrial

5    Services.  A lot of these things are judgment calls, and

6    we've got to sit here and guess.

7            I'm very cognizant of the kinds of things that

8    we see after every one of these mass murders, where there

9    were social media postings that could have given everybody

10   signs that something was going to happen.

11           I just -- it seems to me that Mr. Milstreed,

12   while free for the last 16 or 18 months, if those kinds of

13   manifestations of violence were still active, could have

14   easily done something.  There's no record that he did.  It

15   all seems to have stopped right at that time.  Could even

16   be a form of temporary insanity, in a sense.

17           His age mitigates in my view against the thought

18   that he's going to be doing this again.  I mean, he's not

19   much younger than I am, and things change a little bit when

20   you get older and physical abilities change a little bit.

21           I guess, if I had to apply the clear and

22   convincing standard that he's a danger at this moment, or

23   even in the next six months or eight months until his case

24   can be adjudicated in D.C., I can't say that I'm convinced

25   that he is.

```
 1              So I think I -- I'm not thrilled about a hotel,
 2    per se, because you can just come and go in a hotel room.
 3              MR. BELCHER:  I mean, I think home detention
 4    oftentimes, Your Honor, is a concern of flight risk or risk
 5    of nonappearance.
 6              THE COURT:  Well, that's what's recommended.
 7    So I guess I don't have a fundamental objection to the
 8    restriction of someone's liberty interest during a time
 9    when they're being prosecuted for a federal felony.
10              What's the maximum penalty for -- for any of
11    those offenses, Mr. Neff?
12              MR. NEFF:  I believe it's 20 years for the
13    assault on a federal officer.
14              THE COURT:  Okay.  Not the first offense, the
15    8113, whatever it was.
16              MR. BELCHER:  111(a)(1) --
17              THE COURT:  Okay.
18              MR. BELCHER:  -- would be the most serious
19    offense.
20              THE COURT:  Is it not more than 20?
21              MR. BELCHER:  That's my understanding, Your
22    Honor.
23              THE COURT:  Have you -- are you cognizant of
24    any sentences imposed in the District of Columbia?
25              MR. BELCHER:  I am.  They're a wide range.
```

```
1    I've represented maybe five or six folks that I've kept up
2    with as they've gone through the system.  They've ranged
3    from misdemeanor offers, probation to, I believe, the
4    fellow that was dressed up in the Viking outfit.  I think
5    they called him a shaman or something like that.  He got
6    the range of 41, 51 months, somewhere in that range.  And
7    then I think there's some in between.  Some have gone to
8    trial, got an acquittal.  Some have gone to trial and lost
9    and got some sentences.  So I think there's a wide range,
10   and I'm sure there's a wide range of criminal history as
11   well.
12           THE COURT:  Well, of course, several that I've
13   seen had zero criminal history.
14           MR. BELCHER:  Right.
15           So, nevertheless, as far as the ankle monitor
16   goes, Your Honor, I don't -- while I don't think it's
17   necessary, given that the danger is the prong that was used
18   and there's no evidence of flight risk, if the Court
19   imposes it, I think it's --
20           THE COURT:  Let me ask Mr. Neff.
21           MR. BELCHER:  -- monitor --
22           THE COURT:  So, Mr. Neff, without waiving your
23   argument on detention and at my request to comment on
24   conditions, do you think it's necessary for us to do the
25   GPS, which, you know, in a nonappearance -- non
```

```
 1    nonappearance case, there's just expenses and inconvenience
 2    and a cost to the government of all that.
 3              So do you have a position?
 4              MR. NEFF:  Well, so there's -- as I understand
 5    it, they're recommending both, right?  Home detention
 6    and --
 7              THE COURT:  They are.
 8              MR. NEFF:  So it would be hotel detention, I
 9    guess, is what we're hearing, or, when he does travel back
10    to Maryland, it would be his home there.  And the GPS also
11    gives an added layer of monitoring of the Defendant.
12              I think it -- I understand the Court's concern,
13    but I think it does make sense to have some restrictions on
14    his -- the home detention really is effectively to keep him
15    in the hotel, and then, when he's not working or going to
16    religious activities or medical things, that's what he's
17    doing.
18              THE COURT:  And so what would be -- what would
19    staying in a hotel room 24/7 except for work do to you,
20    Mr. Neff?  Do you think that would be good for your mental
21    health?
22              MR. NEFF:  No.  I'm not --
23              THE COURT:  It wouldn't for mine.
24              MR. NEFF:  No, no.  I -- that doesn't sound
25    like --
```

```
 1          THE COURT:  I've got to think broader.
 2          MR. NEFF:  Well, I understand that.  There's a
 3   concern about that.  That's not an ideal situation for any
 4   human being to operate under.
 5          But, again, as I pointed out -- I just said it
 6   -- it's very liberal.  The home detention allows for those
 7   basic social interactions an individual needs:  grocery
 8   store, church, whatever medical issues.  I mean, he can get
 9   out for those things.  I don't know if they allow for
10   exercise.  I'm not sure about that, but he does have some
11   freedom to do those things.
12          I think the idea here is to kind of control his
13   activity and mingling and mixing and perhaps getting into
14   -- you know, acquiring things.  So I don't think it's an
15   unreasonable condition.  I'd ask the Court to maintain both
16   of them.
17          And then, to the extent he's traveling around,
18   the GPS monitors.  It's obviously very important to just
19   know where he is at various times, in case an incident does
20   arise or he can be tracked appropriately.
21          So I'd ask the Court, to the extent he orders
22   the conditions of release, I'd ask the Court to keep both
23   of those in place.
24          THE COURT:  Why -- why are you recommending a
25   GPS?
```

```
 1              UNIDENTIFIED MALE SPEAKER:  Your Honor, without
 2     being able to speak for Angela --
 3              THE COURT:  You're the guy.
 4              UNIDENTIFIED MALE SPEAKER:  I've heard a few
 5     concerns surrounding being in a hotel and confined to that.
 6     Home detention is pretty restrictive compared to curfew,
 7     but, as well, the options --
 8              THE COURT:  Well, have you ever supervised
 9     someone who had a combination of home detention in a hotel
10     room?
11              UNIDENTIFIED MALE SPEAKER:  I think a period of
12     time ago.  It dropped off my head -- top of my head,
13     though.
14          But if the concern is we don't want the
15     Defendant here going back to the Capitol, D.C., you know,
16     curfew and standalone monitoring are also an option.
17     Standalone monitoring is really, while he is under GPS,
18     monitoring for other conditions specifically.  We don't
19     want him leaving the state, going to D.C. or something
20     along those lines.  And he would be actively able to, you
21     know, exercise and travel within the community without
22     restrictions in that sense.
23              THE COURT:  Tell me, do you -- do you often --
24     well, who most -- who pays for this ultimately?
25              UNIDENTIFIED MALE SPEAKER:  It's based on
```

```
1    ability to pay.
2              THE COURT:  So you do get Defendants to pay for
3    it?
4              UNIDENTIFIED MALE SPEAKER:  Absolutely.
5              THE COURT:  I don't have a problem with it.  I
6    just I can't stand sitting around a hotel room.  I get stir
7    crazy.  It's just -- I don't want to set him up for a
8    failure because it's -- do you have any concern along those
9    lines?
10             UNIDENTIFIED MALE SPEAKER:  Well, again, not
11   speaking for Angela -- I'm not sure what went into her
12   crafting that recommendation -- the alternative is
13   something less restrictive, like a curfew, allowing him to
14   get out and exercise, and he would just need to be back at
15   the hotel within a given period of time.
16             THE COURT:  Where is his workplace?
17             MR. NEFF:  Brighton, Colorado.
18             THE COURT:  Will you have his employer check
19   into an Airbnb?  Would you have a problem with that,
20   staying in someone's home?
21             MR. BELCHER:  No.  I guess we would treat it as
22   a -- as residence if he's --
23             THE COURT:  Is that something you think could
24   be possible?
25             MR. BELCHER:  I don't know.  I can call and
```

```
 1   ask.
 2               THE COURT:  There are long-term Airbnbs.
 3               UNIDENTIFIED MALE SPEAKER:  Sure.  I'm not sure
 4   [inaudible].  I'm sorry, Your Honor.
 5               THE COURT:  [Inaudible].
 6               MR. NEFF:  No.  I was just going to say there
 7   may be restrictions, certainly for Airbnb.  An individual,
 8   who's on federal bond under these circumstances, staying --
 9               THE COURT:  May not want the -- yeah.
10               MR. NEFF:  That's all I'm saying.
11               I understand the Court's concern with this.  I
12   don't know if there's an easy solution for this, but I
13   don't know if the Court -- does the government's arguments
14   about his ability -- he does have some freedom and ability
15   to move around.  I mean --
16               THE COURT:  Can I address Mr. Milstreed?
17               MR. BELCHER:  You may.
18               THE COURT:  Mr. Milstreed, have you been in a
19   hotel room since you've been here?
20               MR. MILSTREED:  Yes, sir.
21               THE COURT:  Are you okay in a hotel room?
22               MR. MILSTREED:  I am.  I'm traveling with this
23   company for eight years.  So whenever I travel, I'm always
24   in a hotel.
25               THE COURT:  And you understand this means that
```

44

```
1    pretrial services will tell you the reasons you can be out?
2              MR. MILSTREED:  I understand.
3              THE COURT:  And one of them will not be social.
4    So your social life is going to go to zero.
5              MS. MILSTREED:  I get it.
6              THE COURT:  It would be for your basic
7    psychological, mental, spiritual, or physical needs.
8    That's all.
9              MR. MILSTREED:  [Inaudible].
10             THE COURT:  Yes, of course.  Yes.
11             MR. MILSTREED:  Will I be able to exercise?
12             THE COURT:  Do they have a -- a fitness room?
13             MR. MILSTREED:  They do not.
14             THE COURT:  Where do you exercise right now?
15             MR. MILSTREED:  [Inaudible].
16             UNIDENTIFIED MALE SPEAKER:  Your Honor, under
17   home detention, discretionary leave for pretrial
18   individuals is not something that we generally approve.
19   That's typically saved for post-conviction.
20             So, again, curfew may be more suitable and
21   appropriate to allow him to travel to the gym.
22             THE COURT:  And so, Mr. Neff, if we do curfew
23   and GPS, then you do know where he is at all times.  Is
24   that a decent combination?
25             MR. NEFF:  Right.  Well, I've stated my -- the
```

```
 1    government's position, but, obviously, that would be a
 2    middle-range compromise that might accomplish some of the
 3    goals the Court is seeking.  I don't disagree with that.
 4              THE COURT:  So, Mr. Milstreed, there's --
 5    there's competing interests on what I should do with you.
 6    They're legitimate.  Both sides have legitimate arguments.
 7              MR. MILSTREED:  I appreciate it, sir.
 8              THE COURT:  This is -- this is something that
 9    is sort of quintessentially a judicial function, and that
10    is exercising discretion in a particular matter.  And --
11    but acknowledging the legitimate arguments on both sides, I
12    just wouldn't give you any -- any leeway in how you honor
13    the things that I impose on you.
14              If you stray, if you try to push the limits, if
15    you try to, you know, I guess, dance around the edges, it
16    doesn't work that way.  This is sort of you've got to stay
17    in the center line at all times.  You can't go off to
18    either side.
19              Does that make sense?
20              MR. MILSTREED:  Yes, Judge.  Very clear.
21              THE COURT:  All right.  So what are your work
22    hours?
23              MR. MILSTREED:  So typically from -- typically
24    from 6:00 until 4:00.  So I would leave the hotel about
25    5:30.
```

```
 1              THE COURT:  And when do you work out?  When you
 2   get off work?
 3              MR. MILSTREED:  At the gym directly after work.
 4              THE COURT:  Well, personally, I work out six
 5   days a week.  I think it's important for my mental health.
 6              MR. MILSTREED:  It's important.
 7              THE COURT:  So I'm sorry, and when are you
 8   usually home?
 9              MR. MILSTREED:  I'm usually home -- so, again,
10   at 4:30.  I'm home by quarter to 6:00.
11              THE COURT:  What do you do for meals?
12              MR. MILSTREED:  So we have -- there's a kitchen
13   at -- I cook some.  [Inaudible].  So I eat out a lot, to be
14   honest with you, at this point because it is kind of an
15   inconvenience.  You don't have the proper cookware.  But I
16   eat out a lot, and I also eat in.  And I really wouldn't
17   need to leave [inaudible].
18              THE COURT:  Can you abide by an 8:00 p.m. to
19   5:00 a.m. restriction to be in that room?
20              MR. MILSTREED:  Say it again.  8:00 p.m. to 5:00
21   a.m.?
22              THE COURT:  8:00 p.m. until 5:00 a.m.
23              MR. MILSTREED:  Yes, sir.  That's not problem.
24              MR. BELCHER:  That sounds reasonable, Your
25   Honor.
```

```
 1              THE COURT:  All right.  So your hours on curfew
 2     will be 8:00 p.m. to 5:00 a.m. in that room.  What's it
 3     called?
 4              MR. MILSTREED:  It's Inn the Woods Suites and,
 5     it's [inaudible].
 6              THE COURT:  Okay.  And you've had that same
 7     room for how long?
 8              MR. MILSTREED:  Well, so when you say "same
 9     room," the same room.  I had the same hotel.  I went home
10     last year for Thanksgiving for five days.  I came back.  I
11     went home for Christmas for 11 days and came back.
12              THE COURT:  All right.  So you get a different
13     room each time?
14              MR. MILSTREED:  I get a different room each
15     time.
16              THE COURT:  Mr. Neff, with regard to travel to
17     Baltimore -- is it Baltimore?  Where are we talking about?
18              MR. NEFF:  D.C., District of Columbia.
19              THE COURT:  No, no.  But does he live in --
20              MR. MILSTREED:  Oh, no.  I live outside of
21     Baltimore 40 miles.
22              THE COURT:  Yeah.  Right.
23              Which side?  This side?  The D.C. side of
24     Baltimore?
25              MR. MILSTREED:  West side of Baltimore.
```

```
 1              THE COURT:  Which is what city?

 2              MR. MILSTREED:  I live in Pittsburgh.

 3              THE COURT:  Okay.

 4              MR. MILSTREED:  Imperial County.

 5              THE COURT:  But is that where your father is?

 6              MR. MILSTREED:  Yes.  Yes, sir.

 7              THE COURT:  Okay.  Mr. Neff what's your

 8     position on his ability to travel to his permanent

 9     residence?

10              MR. NEFF:  Certainly, yeah.  To the extent the

11     Court imposes the order, which obviously we object to, but,

12     yes, he would need to go to -- I noticed on the conditions

13     they did include Maryland.  So it's state of Colorado,

14     Washington, D.C.  I'm looking at Condition 9.  And it

15     should include Maryland as well.  I agree.  He should have

16     that freedom to do that for obvious reasons.

17              THE COURT:  Okay.  I agree.

18              What I would like you to do, though, is every

19     time you intend to go -- you can only be in Colorado, in

20     Washington, D.C., for these appearances in the court of

21     origin and travel to your home in -- Pittsburgh, you said?

22              MR. MILSTREED:  Pretty much.

23              THE COURT:  And you need to advise pretrial

24     services.

25              How -- how -- typically how much in advance do
```

```
1   you typically know when you're going to be traveling?
2              MR. MILSTREED:  So I know a few weeks ahead of
3   time, if we're slowing down at work and they have -- they
4   have the opportunity to let me go visit the family.
5              THE COURT:  All right.  So if I told you you
6   had to give pretrial services 10-days' notice before you
7   travel?
8              MR. MILSTREED:  [Inaudible].
9              THE COURT:  All right.  You'll have to give
10  them 10-days' notice and let them know the days you're
11  going to be there.  Okay?
12             MR. MILSTREED:  Will I get all this in writing?
13             THE COURT:  It's going to be in writing.  Yeah,
14  it will be in writing, and I think Mr. Belcher will take
15  special care to go over those with you.
16             Okay.  And are you going to need -- well, in
17  deference to you, Mr. Neff, and the nature of the
18  circumstances, are you going to request any -- any period
19  of stay?
20             MR. NEFF:  Yes, I have.  I've been in
21  communication directly right now with the underlying
22  Assistant U.S. Attorney, Emily Allen, in Washington, D.C.
23             Yes, she definitely wants a stay.  She plans to
24  appeal this to the chief judge or the judge with the
25  original jurisdiction in Washington, D.C.  So I am asking
```

1   for a stay.

2          We -- we had seen -- we had both reviewed the

3   pretrial services report, and I told her to start getting

4   the paperwork ready.  So we're trying to do that forthwith.

5          But I would ask until -- I'm sorry this is the

6   day we're on it, but I'd ask until the conclusion of

7   Tuesday to -- for a stay, because it does take time to get

8   in front of --

9          THE COURT:  Well, that's all I could do.  I

10  mean, Monday is a federal holiday.

11         MR. NEFF:  Right.  So in --

12         THE COURT:  So, Mr. Milstreed, here's -- here's

13  the issue.  Judges are not cookie cutter.  We're regular

14  people too, and we all have views on things.  So my view

15  may be different than somebody who's above me.  And this

16  will be apparently reviewed by a U.S. District Judge in

17  Washington, D.C.

18         MR. MILSTREED:  They'll see all the conditions

19  that I'll be under?

20         THE COURT:  Well, they'll see the conditions,

21  but they're going to be focused on whether you should be

22  detained or not, and I can be reversed.

23         I have been reversed in an hour before.  So

24  that's -- but that doesn't affect what I do.  I believe

25  what I'm doing is right or I wouldn't be doing it. Okay?

```
 1    But some Judge may disagree.

 2              Supreme Court opinions are often five to four

 3    with the nine smartest people in the United States

 4    disagreeing with -- with one another, you know, on what the

 5    law is.  So people just disagree, and the buck stops at the

 6    person's desk who has the most power, and that's not

 7    me.

 8              Okay.  So it will be a -- do you have the

 9    ability to post any bond?

10              MR. MILSTREED:  I don't [inaudible].  All my --

11    my debit cards, my wallet, my driver's license are all in

12    the shop I work at in Brighton.  So I do have money on my

13    debit card.  So, yes, I can post money, but I need to have

14    my hands on my card.

15              THE COURT:  And you have the 2,500 bond?

16              MR. MILSTREED:  Absolutely.

17              THE COURT:  All right.  I'm going to do 2,500

18    cash.

19              Is that okay, Mr. Belcher?

20              MR. BELCHER:  It's better than being detained.

21              THE COURT:  You'll be supervised by our local

22    pretrial services office.  You must continue to maintain

23    your employment, may not attempt to obtain any passport or

24    travel internationally.  You'll be restricted to the state

25    of Colorado; Washington, D.C.; and your home in Baltimore,
```

```
 1   outside of Baltimore.  Again, I want you to give 10-days'
 2   notice.
 3              MR. MILSTREED:  Does that also apply to me when
 4   I come back to work too?
 5              THE COURT:  Are you writing -- I'm assuming
 6   you're writing these down, because I don't have bond
 7   paperwork with me right now.  All I have is a pretrial
 8   services.
 9              MR. MILSTREED:  So, a lot of times when I come
10   back to work, they call me, like, a day or two before.  So
11   I doesn't -- I don't know 10 days in advance, but I can
12   actually --
13              THE COURT:  You mean once you have to come back
14   from Baltimore too?
15              MR. MILSTREED:  Yeah.  Once I come back to come
16   to work, I can let them know that I need 10-days' notice.
17              THE COURT:  Well, no.  Just -- three-days'
18   notice will be fine.  To come back.
19              MR. MILSTREED:  Three days to come back.  Okay.
20              THE COURT:  So it's monumentally important that
21   you not contact people who are charged with this kind of
22   offense who are victims or witnesses.  And, I mean, I don't
23   know if I can, but --
24              Can I put a no social media restriction on
25   people?  Is that lawful?
```

```
 1              MR. BELCHER:  I don't know.  I know there's a
 2    lot of law concerning that, on whether those conditions
 3    for, like, sex offender purposes when they're released and
 4    whether or not they can keep them from the Internet.
 5              I would say he's not active on social media
 6    anymore, and I believe speaking for him, I'd say he has no
 7    problem with that.  And so we wouldn't object to that.
 8              THE COURT:  Okay.  Let's have no social media
 9    posting.
10              Can't be around a gun.  You know that.  Okay?
11    [Inaudible].  You say you've been dry for 25 years, so no
12    -- I'm going to put no alcohol provision.
13              MR. MILSTREED:  Okay.
14              THE COURT:  May not possess or use any illegal
15    substance.  That includes marijuana under federal law.  May
16    be required to be tested for substances.  I am not, at the
17    moment, seeing a need for inpatient and outpatient
18    substance abuse therapy.
19              Is that still something, [inaudible], that
20    you're -- that you're wanting?  I mean, if you do, that's
21    fine.
22              MR. NEFF:  Well, there's been a -- I think a
23    mixed bag of what we're hearing as far as 25 years of
24    sobriety.  Back in 2004 cocaine.
25              THE COURT:  I'll leave it to your discretion.
```

1   Okay?

2           I think it could be dictated on drug testing

3   results.

4           THE COURT:  You'll have the discretion to do

5   that.

6           It will be a curfew, and you must be in your

7   residence from 8:00 p.m. to 5:00 a.m. with GPS and be

8   required to pay all --

9           MR. MILSTREED:  So when you say in my residence,

10  can I still be down in the lobby doing laundry after eight

11  o'clock.

12          THE COURT:  In the building.

13          MR. MILSTREED:  Oh, okay.

14          THE COURT:  In the building.  Yeah.  I mean --

15          MR. MILSTREED:  Sometimes I get up early in the

16  morning to do it.

17          THE COURT:  No.  I mean, if they have a --

18          MR. MILSTREED:  I'm doing laundry.

19          THE COURT:  If they have continental breakfast

20  or coffee at night.

21          MR. MILSTREED:  It's difficult to get into the

22  laundry room (inaudible).

23          THE COURT:  Now, I mean, treat -- I'm fine if

24  you treat the place as your home and your room is your

25  bedroom.  Okay?

```
 1              You may not act as a law -- (inaudible) law
 2    enforcement agency without permission of the Court, and if
 3    you have contact with a law enforcement officer of any
 4    kind, you need to report that to pretrial services
 5    immediately.
 6              I've got to exercise the discretion to do a bond
 7    release on Wednesday morning at 10:00 absent --
 8              MR. MILSTREED:  Judge, can I ask you -- I guess
 9    I'll have to look myself.  I'm wondering if I qualify for a
10    driver's license in Colorado.
11              THE COURT:  Well, if you have a license in
12    Baltimore, it applies -- works nationwide.  So I don't know
13    what you're saying.
14              MR. MILSTREED:  So it expires in September.
15              THE COURT:  Oh.  Well, you have to go back and
16    renew it, right?
17              MR. MILSTREED:  (Inaudible).
18              THE COURT:  Yeah.  Yeah, of course.  That's
19    legitimate travel to keep your driver's license current in
20    my view.  Because if you drive to work, I'm not going to
21    require you to engage in any contact that would require you
22    to drive illegally.
23              MR. BELCHER:  Your Honor, I'm in front of Judge
24    Rodriguez at 10:00 a.m. on Wednesday.  I can try to have
25    someone else come if that's --
```

```
 1              THE COURT:  Well, it's a bond release.  You
 2    don't even have to be here.
 3              MR. BELCHER:  Yeah.
 4              THE COURT:  You can if you want.  So I can --
 5              MR. BELCHER:  I'll have somebody here.
 6              THE COURT:  Can we do it at 11:00?
 7              MR. BELCHER:  Sure.  That works.
 8              THE COURT:  Eleven o'clock on -- on Wednesday.
 9              MR. BELCHER:  That works.  Thank you.  I just
10    prefer to be present when my clients are here.
11              THE COURT:  I would, if I were you.
12              Yeah.  I'm not sure I should say anything else.
13              MR. MILSTREED:  Sir?
14              THE COURT:  Yes.
15              MR. MILSTREED:  I have a question about the
16    $2,500.  (Inaudible) down Wednesday, how soon do I have to
17    get this $2,500 to the courts?
18              THE COURT:  By Friday, if you can.
19              MR. NEFF:  Okay.  Your Honor, just a quick
20    point of clarification.  Did you say "shall not utilize
21    social media" or "shall not post on social media"?
22              THE COURT:  Well, depending on how you define
23    "social media," it's almost impossible to avoid it, looking
24    at it.  Post.
25              Yeah.  Could you guys approach for a second?
```

```
 1                (Pause in recording.)

 2                THE COURT:  Anything further from the United

 3     States, Mr. Neff?

 4                MR. NEFF:  No.  Thank you, Your Honor.

 5                THE COURT:  Would you -- did you want this USB

 6     back?

 7                MR. NEFF:  We're probably going to want it to

 8     be part of the record.  I don't know how we --

 9                THE COURT:  What is it -- so it's in a sleeve,

10     conventionally submitted material.  So I think it's -- is

11     it part of the docket?

12                MR. NEFF:  Yes, it is.

13                THE COURT:  It is part of the docket.  So it's

14     -- it's a -- it's part of the official court record.

15                MR. NEFF:  Can we keep it with the court in

16     case someone calls for the record?

17                THE COURT:  We'll keep it with the court.

18                MR. NEFF:  Okay.  If we could for right now.

19     Yeah.  I'll make sure it's maintained.  We have a placed to

20     store conventionally submitted material somewhere in the

21     courthouse, don't we?

22                THE CLERK:  Yes, we do.  Clerk's office.

23                THE COURT:  We'll take care of that for you.

24                And, as you know, this doesn't involve a written

25     record.  If you thought it was important, I would do that,
```

```
 1   because we don't do written records on releases.
 2            Do you think that's important or not?
 3            THE COURT:  It may be requested.  I'll have to
 4   check with my colleague to find out for the purposes of the
 5   appeal.  So --
 6            THE COURT:  Would you let me know?  And I can
 7   draft up a written order of release.
 8            MR. NEFF:  Oh, yes.  Yes.  If you could do some
 9   type of release order, it might be necessary, Your Honor.
10   I'm sorry.  Could the Court do that?
11            THE COURT:  I will do that, yes.
12            MR. NEFF:  Yes.
13            THE COURT:  Are you okay with that?
14            MR. BELCHER:  I think it would be helpful, Your
15   Honor.
16            THE COURT:  All right.
17            MR. BELCHER:  So the Court can review, I think.
18   Some Courts treat it differently.  I know the most recent
19   one I had was Judge Moore, and he treats it as a review of
20   the record.  He doesn't have, like, a whole new, full-blown
21   detention hearing.  He reviews the record to determine
22   whether or not the Court made the appropriate findings
23   based on the evidence presented.
24            THE COURT:  So I'll probably use the same form
25   I would normally use for detention, but it will just be an
```

1    order resulting in release.

2                MR. BELCHER:  Sure.

3                THE COURT:  With analysis, of course.

4                MR. BELCHER:  That makes sense, Your Honor.

5                THE COURT:  All right.  We'll do that.

6                MR. NEFF:  Thank you, Your Honor.

7                THE COURT:  We'll be in recess.

8                MR. BELCHER:  Thank you.

9                THE CLERK:  All rise.

10               (This concludes the requested audio transcript

11   of proceedings.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         REPORTER'S CERTIFICATE

2         I, Elissa Steen, Registered Professional Reporter

3 and Notary public in and for the State of Colorado, do

4 hereby certify that I have listened to and transcribed

5 requested audio file.  I certify that this transcript is a

6 true and correct transcription to the best of my knowledge

7 and ability.

8

9 Dated June 1, 2022

10

11

12                          _____

13                          Registered Professional Reporter
                                     and

14                              Notary Public

15

16

17

18

19

20

21

22

23

24

25













GOVERNMENT
EXHIBIT

**Exhibit 37**



