A UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-198 (JEB)** |
| **RODNEY KENNETH MILSTREED** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Rodney Milstreed to 78 months' incarceration, the high end of the 63- to 78-month Guidelines range agreed to by the parties.   In addition, the government requests that the Court sentence Milstreed to three years' supervised release, a $100 special assessment for each of the two felony counts of conviction and $10 for the misdemeanor, and restitution in the amount of $2,000.[1]

### I.      INTRODUCTION

The defendant, Rodney Milstreed, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in

---

[1] One of the victims of the assault charged in Count One, U.S. Capitol Police Officer D.G., received medical treatment as a result of the assault and may seek restitution for costs associated with his injury.  The Government will supplement this Memorandum if any additional details become available.

losses.[2]

Milstreed, a machinist from Maryland, began planning to commit violence at the Capitol long before January 6.   In late 2020, he began injecting steroids to get "jacked," procured a wooden club, sought out ammunition supplies for his collection of assault rifles and other firearms, and prepared himself for battle.   As he said on social media, he intended to "crack some skulls" at the Capitol.   And Milstreed followed through with those plans.   On January 6, 2021, with his four-foot wooden club disguised as a flagpole, he made his way to the restricted grounds of the U.S. Capitol just as it was first being breached, got to the front of the mob, and broke through the police line, where he went on the offensive.   He attacked a line of police officers.   He assaulted a member of the news media, nearly pushing him down a set of three or four stairs.   He attempted to break through bike-rack barriers, screamed at the police, and hurled a smoke grenade into the police line.   Afterwards, he bragged that he had "fucked them federal cops up," and said that punching the camera man "felt good."   All this, in Milstreed's words, was done in an effort to "get our hands on the politicians.   We want to drag them in the street and put the fear of God in their soul."   His actions were calculated to influence and affect the conduct of government by intimidation and coercion, and to retaliate against government conduct.   All the while, Milstreed was sitting on a stash of weapons and ammunition at his Maryland home, including an unregistered short-barrel AR-15 variant assault rifle.

---

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

The government recommends that the Court sentence Milstreed to 78 months of incarceration for his violation of 18 U.S.C. § 111(a) and (b), and to concurrent sentences of 78 months for his violation of 26 U.S.C. § 5861(d) and 12 months for his violation of 18 U.S.C. § 113(a)(4).

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF 31, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Milstreed's Role in the January 6, 2021 Attack on the Capitol

*Milstreed's Planning for January 6*

After the 2020 Presidential election, Rodney Milstreed made online comments and social media posts expressing his displeasure at the results.  As early as November 5, 2020, two days after the election and before the results had been tabulated, he told his Facebook friend Anne,[3] "I'm ready to stand with patriots to over throw this shit Live or dead[.]   We cannot walk away from this shit[.]"   *See* ECF 8, Exhibit 1. On November 9, 2020, Milstreed messaged his Facebook friend Trent, "Gonna get ugly when they overturn these v[o]tes[.]" He then sent Trent the photos shown below, showing two assault weapons, two upper receivers, miscellaneous gun parts, several loaded magazines, and multiple large boxes of ammunition. *See* ECF 8, Exhibit 2. (Later, when

---

[3] The full names of Milstreed's Facebook and other online associates are redacted here for their privacy. The Facebook messages have been provided here as they were written. The Facebook exhibits attached to this Motion do not include icons or emojis, but the electronic data provided by Facebook does include that metadata, so icons and emojis have been reproduced here where possible.

the FBI searched Milstreed's Maryland home in 2022, they discovered the same weapons and confirmed this photo was taken from Milstreed's bedroom.)

 

Milstreed described these weapons as "just a few" and "Some of the sleeping giant," suggesting that he had access to an even larger armory. *Id*.   Milstreed also sent Trent a selfie where he referred to himself as "Skin head and all son" and threatened, "These mother fuckers dont want me to start doing cocaine again son[.]" ECF 8, Exh. 2.

Milstreed's suggestions of violence quickly bloomed to overt threats. On November 11, 2020, Milstreed's Facebook friend Anne sent a TV screenshot from Fox Business showing alleged fraud in the election results. ECF 8, Exhibit 3. Milstreed replied, "I so sick of these fucks. Think we're just gonna let them have it. Over alot of dead bodies." He opined, "If someone furnishes them with guns, we're gonna have are [sic] hands full[.] I see war either way[.]" He told Anne, "I just bought 2,000 dollars worth of steroids. When it happens I'm going full retard." Apparently referring to Joe Biden, he said, "Beady eyed creep needs to be hung for treason." *Id.*

On November 25, 2020, Milstreed posted several comments on others' Facebook posts. In one, apparently referring to election-related lawsuits, he said, "I pray every night. I hope we dont

have to hurt anyone. THESE JUDGES BETTER DO THE RIGHT THING." Later that day, he commented, "We the people are the ones that have to do the punishing. 💯💯💯💯💯." In a third comment, he made reference to "a up coming civil war." ECF 8, Exhibit 4.

On December 20, 2020, Milstreed posted additional photos of his collection of assault rifles, guns, and ammunition. In a conversation with Facebook friend Marsha, who was upset about the results of the election, he reassured her, "Don't give up on Trump. This man is a beast of a patriot. He won't be giving our country up to a crook. FACT. GONNA BE EPIC." ECF 8, Exhibit 5. He predicted that "it" would be "[v]ery messy in the big cities, but that ain't shit compared to socialism. We will fuck these punks up[.]" He showed her more photos of weapons he had arrayed on his bed:



As he had the previous month, Milstreed described these weapons to Marsha as "Just a peice of my second Amendment[.]" *Id.*

Despite possessing this armory, Milstreed desired to amass more weapons, and on December 22, 2020, he lamented to Facebook friend Jeremy that he "[c]an't get any good guns or ammo . Something brewing[.]" ECF 8, Exhibit 6. He said he needed to get a forge to make his

own weapon – "Something that will take a limb.😁 Just in case it comes hand to hand[.]" (He was also considering alternatives to firepower; as Milstreed had put it in one Facebook comment on December 8, 2020, "Thing is dont need no gun just a ball bat will do the trick. The sound 😁." ECF 8, Exhibit 7.)

On December 23, 2020, he commented on a post by then-President Trump, "To hell with them Trump don't hand over the keys. We will handle the outside u handle the inside." ECF 8, Exhibit 8. He hoped and expected that Trump would continue to occupy the White House, and he was willing to use violence to assist that goal. Around this time, according to a note he sent Facebook friend Vanessa, Milstreed "put a bid in to join proud boys[.]" He joked about who he needed to punch to get admitted. Vanessa warned him about saying too much over email, for fear of sting operations. ECF 8, Exhibit 9.   Nevertheless, on December 25, 2020, Milstreed did use his email account to reach out to the "Marylandproudboys@xxxxx.com," using the subject line "Pissed off patriot," and asked, "I would live to become a proud boy . Before 1-6-2-21[.]"

| From: | rodney mi streed |
| Subject: | Pissed off patriot |
| To: | Mary andproudboys@ |
| Sent: | December 25, 2020 7:34 PM (UTC-05:00) |

I would live to become a proud boy . Before 1-6-2021

Milstreed believed Trump would prevail and that plans were afoot for a big event on January 6. At the end of December, he began, unsuccessfully, looking for a friend to join him in D.C. for the riot. On December 27, 2020, Milstreed invited his friend Bob, and offered, "If u wanna go I got an extra flag and flag pole." ECF 8, Exhibit 10. One of the three flags he showed off to Bob in the photo he shared, shown below, was a Confederate flag. Apparently referring to the

divisiveness of Confederate flag symbolism, Milstreed told Bob, "I got these for bait. This is what their [sic] biting on. 😁" *Id*.



A couple of days later, Milstreed sent Bob a link to a YouTube video purporting to be a news report about voting irregularities. He reiterated that he was going to D.C. on the 6th "with some hard hitting hillbillies. 😁. We won't be tolerating any resistance. 💯% FACT." *Id*. Milstreed followed up with a selfie he took in front of a mirror in what appears to be a Planet Fitness gym locker room, wearing weightlifting gloves, and noted, "Might be old but I got some life left. Enough to crack some skulls." He added, "Its a shame our government has put us in a very bad time."

Milstreed also tried to recruit his Facebook friend James to join him in D.C. on January 6. ECF 8, Exhibit 11. When James declined, Milstreed begged, "Come on bro. I got steroids… Powerful shit… I got flags too[.] Pick handles[.] With flags[.]" *Id*. at 3. He told James, "Come on I need another animal with me." *Id.* at 4. Milstreed sent pictures of his steroids, which he claimed,

"got me jacked." He sent photos of his own body to prove it, including a selfie Milstreed took in his undershirt that caused James to warn, "holy fuck be careful with that shit[.]" *Id.* at 8. Milstreed's response was simply, "I'm gonna skull bust some antifa. 😡" *Id*. He showed similar pictures to Facebook friend Patrick, and told him, "Its a steroids stacker. Its got me jacked[.] Ready for DC[.]" Milstreed explained, "Someone needs to hang for treason[.]" ECF 8, Exhibit 12.

On December 29, 2020, in a conversation with Facebook friend Jerry, Milstreed revisited his comment from a week earlier about guns and ammunition. ECF 8, Exhibit 13. When Jerry asked him "you try buying ammo, lately ??????," Milstreed responded, "Can't get any[.]" He said he knew someone with 300,000 rounds but wouldn't sell it. Then he sent a selfie photo with the caption, "Jacked[,]" and a picture of his injectable steroids. He told Jerry, "Got some juice also[.] I ain't playing." *Id*. at 6.

Milstreed continued his effort to recruit friends to join him. On December 30, 2020, he asked Facebook friend Jim to come with him to D.C. on January 6, and showed a photo of the sturdy wooden poles he had procured for the occasion (which he in fact brought to the Capitol on January 6, 2021, and in fact used to assault police officers there), with his foot to provide scale.



ECF 8, Exhibit 14. Milstreed made it clear to Jim that he bought the pick handles for their use as weapons: "I got two pick handles and flags for them[.] Take the flag take a licking[.]" *Id.* at 4. He resolved, "Wont be no refugee here. I'm cracking skulls." He advised his friend, "Might wanna bring a good knife[.]" *Id.* at 6. Ultimately, Jim did not join Milstreed for the event.

After the new year, Anne sent Milstreed a link to a video titled "Biden, Obama, Hillary EXECUTED Seal Team 6." Milstreed responded, "Wow[.] There all gonna hang[.]" He sent a selfie in which he wore weightlifting gloves and stood in front of what appears to be a tanning bed, and said, "I'll be cracking skulls on January 6[.] YEE YEE LMAO[.]" ECF 8, Exhibit 15. On January 4, 2021, he texted his friend Brian, "Going to DC.   Punching the first democrat I see. They should hold their head in shame for the rest of their days[.]"   He added, "LMOA Man or women don't matter."   The next day, January 5, he sent Anne another selfie through Facebook, this time showing him in the middle of the gym straining his muscles. The message read, "Dc tomorrow. I'm punching the first BLM I see. 💯 fact. Shhh[.]" ECF 8, Exhibit 16. He said he expected "a real show" and that "People are going down right on the congress floor[,]" or at least that was his hope. *Id.* at 2.

### Milstreed's Violent Acts at the Riot on January 6, 2021

On the morning of January 6, 2021, Milstreed took the train from his home in Maryland to Washington, D.C. He told his online associates that he planned to stage at a particular bar near Union Station, which he chose because he read it was a "PROUD BOYS BAR." *See* ECF 8, Exhibit 17.

Milstreed went to the Trump rally at the Ellipse, apparently by himself. He then moved with the crowd to the Capitol building, carrying his makeshift pick handle/flag pole with him, as seen below:

9



Around 1:00 p.m., Milstreed was just behind the initial breach of the Capitol grounds at the Peace Circle leading to the Pennsylvania Avenue walkway. He quickly approached the police line at the West Plaza steps. Milstreed placed himself at the front line of the mob and broke through the line. As he passed the overwhelmed police, he shouted obscenities and kept pressing forward, as shown in the below screenshot from an open-source video:[4]

---

[4] Available at https://www.youtube.com/watch?v=V3KpiJzBM6M&t=505s.



Milstreed and the rest of the crowd quickly overwhelmed the U.S. Capitol Police ("USCP") force and took over the plaza. Still frame images from surveillance cameras pointing down and eastward at the plaza from above the Capitol building show how quickly the mob descended on the area:



USCP officers lost the line quickly, and were only able to regain some ground when D.C. Metropolitan Police ("MPD") officers arrived as backup, bringing with them bike rack barricades. By around 1:30 p.m., the officers had gained some territory and kept the crowd back near the West Plaza Steps.

Between 1:00 p.m. and 1:30 p.m., however, a battle raged for control of the West Plaza, and Milstreed was front and center of the fight. He surveyed the crowd, still holding his wooden pole, at the font of the line near already-beleaguered police officers:[5]



In surveillance footage taken by a Capitol Police officer, Milstreed can be seen in the same area, at the southeast corner of the Upper West Plaza. *See* ECF 8, Exhibit 18 (video from USCP surveillance). As the crowd grew more agitated, so did Milstreed, and he launched his four-foot wooden club into the line of officers. The pick handle, with the flag still attached, hit an officer on the head and glanced off the officer's helmet at high speed.

---

[5] Available at https://www.youtube.com/watch?v=wUmomtBJg0U.



*Exhibit 18 (timestamp 0:33): Milstreed holding pick handle with flag*



*Exhibit 18 (timestamp 0:34): Milstreed after launching pick handle (in yellow box)*

In other surveillance video taken by USCP officers from a nearby angle, the police line that

Milstreed targeted can be seen.  His club glanced off the first officer's helmet at high speed.

Then it struck one of the officers at the back of the line, USCP Officer D.G.   The club's mid-air flight and contact with D.G. can be seen on this video footage.   *See* Exhibit A (video from USCP surveillance footage).



*Exhibit A (timestamp 0:20): Officer D.G. as Milstreed's club striking officer's head*



*Exhibit A (timestamp 0:20): Close-up view of Milstreed's club striking Officer D.G.*

Officer D.G. recalled that he was positioned on the second level of the inauguration stage on January 6, 2021, but he went down to the lower level to join his fellow officers when he saw rioters throwing bottles toward the stage, which he saw were fizzing as though they might explode. He was in the second row of officers, behind the front line who were actively attempting to push rioters back from the stage.   Officer D.G. was looking down toward the ground when he felt an unknown object hit him hard in the head.   He did not see who or what hit him, but when he looked back down he saw a flag pole on the ground and concluded that was the object that struck him. Shortly thereafter, someone in the mob began spraying a chemical agent toward the officers, and Officer D.G. felt his eyes become slightly irritated and he began coughing.   He was led up to the upper level and into the Capitol building, where he received treatment in the Crypt.   Once inside, he learned that rioters had breached the building, so Officer D.G. was led to the Longworth building and then to an outside facility to receive medical treatment.   He was diagnosed with a concussion.   The next day, Officer D.G. received medical care at another facility, where he was again diagnosed with a concussion.

The MPD reinforcements arrived shortly after Milstreed hurled his club at Officer D.G. and the front line of USCP officers.   When MPD arrived, the officers began quickly constructing a makeshift fence out of bike rack-style barriers. Milstreed found himself behind the police line with the rest of the crowd. Milstreed took some video footage, which he shared with some of his Facebook friends. In one video, Milstreed surveys the crowd and yells, "Let's take 'em! C'mon! Let's fucking drag 'em out! … Let's drag 'em out. There ain't enough of them!" *See* ECF 8, Exhibit 19 (video recovered from Milstreed's Facebook records). Based on this and Milstreed's related Facebook comments, it appears that he was inciting the rioters to drag out the legislators working in the building.

After the police established their precarious line, an individual high up on the media tower captured footage of Milstreed using a smoke grenade against the police.   *See* Exhibit B (YouTube video from media tower).[6]   In this video, which was published to YouTube, USCP and MPD officers behind the barricade can be seen picking up a smoke grenade and throwing it into the crowd they were attempting to disburse. The object landed in the crowd of rioters, and Milstreed ran towards it. Milstreed then picked up the smoke grenade and launched it back towards the police officers across the barricade. Still frame shots from the video are shown below:



*Exhibit B (timestamp 1:04): Police officers with the smoke grenade on west side of barricade*

---

[6] Available at   https://www.youtube.com/watch?v=Qdr3mltKHA0&t=1633s, at approximately 27:00.



*Exhibit B (timestamp 1:07): On east side of barricade, smoke grenade lands and Milstreed, circled, runs toward it*



*Exhibit B (timestamp 1:10): Milstreed picks up the smoke grenade and launches it toward the police line*

At around 1:35 p.m., Milstreed thought he had found the opportunity he had been looking

for to "skull bust some antifa" and "punch[] the first BLM I see." *See* ECF 8, Exhs. 11, 16. A

photographer from the Associated Press was in the crowd on the Upper West Plaza. Based on

video taken by the photographer's colleague, it appears the crowd may have believed that the photographer was a member of antifa, and he came under attack. Milstreed was among the first to assault the photographer, grabbing on to his backpack and yanking him down the steps.  *See* Exhibit C (Instagram video by "julythephotoguy").[7]



*Exhibit C (timestamp 0:07): Milstreed yanking photographer down a set of steps on the Upper West Plaza while grabbing onto his backpack*

After the photographer stumbled to the bottom of the stairs, Milstreed shoved him and advanced toward him in a threatening fashion.

---

[7] Available at https://www.instagram.com/p/CJxKMArpN0_/.



*Exhibit C (timestamp 0:09): Milstreed pursuing the photographer in a threatening manner*

Later in the same video, the crowd can be heard asking, "Who is he?" and answering, "Antifa."
*See* Exh. C (approx. timestamp 0:50).

Milstreed continued his assaults on the police officers who were working hard to maintain their position on the plaza. He moved south and mounted an attack on the bike racks themselves, hoping to break through. Officers were standing watch behind this line and fending off repeated attempts by the rioters to pull on the bike racks and assault the officers. Video posted online shows that an MPD officer yelled at the rioters to "back off" or "back up."   *See* Exhibit D (Daily Caller YouTube video).[8]   At around 2:05 p.m., Milstreed approached the barricade, grabbing the bike rack. When he attempted to yank it free, the officer sprayed Milstreed with pepper spray. Only then did Milstreed back off.

---

[8]  Available at
https://ia904505.us.archive.org/5/items/p3CppCyeHTughshQB/p3CppCyeHTughshQB.mpeg4.



*Exhibit D (timestamp 0:35): Milstreed yanking on bike rack and attempting to grab it from officers*



*Exhibit D (timestamp 0:37): Milstreed as he is sprayed in the face with pepper spray*

Milstreed filmed his approach to this line, as he watched other rioters joining in the effort to break down the barricade. As video recovered from his Facebook records shows, Milstreed shouted to the crowd, "Let's get 'em! Let's fucking get 'em!" several times. This time, in context, it seems Milstreed was referring to the police officers trying to regain order.

Soon after this, Milstreed moved north, joining the crowd at the bottom of the Northwest Stairs. As he watched rioters swarm the steps and take over the exterior of the building, he cheered, "Let's make history!" *See* ECF 8, Exhibit 20 (video recovered from Milstreed's Facebook records). From the same area, he filmed himself cheering, "They're taking the building. Hallelujah! 'Merica! Fuck yeah, I'm getting in on them fucking [unintelligible]. Fuck yeah, let's go to the top." ECF 8, Exhibit 21 (video recovered from Milstreed's Facebook records). He made his way upstairs to the Upper West Terrace where the building had been breached by fellow rioters. While there, Milstreed a voice that sounds like Milstreed's shouted at the police, "Stand down, LEOs! Our country needs you! They're evil!" Then they added, "You're all fucking evil." ECF 8, Exhibit 22 (video recovered from Milstreed's Facebook records).

Milstreed was on the Upper West Terrace at around 2:50 p.m. By this time, police had secured the breach point and Milstreed was unable to enter the Capitol building.

Milstreed kept several of his Facebook friends up to date in real time on the afternoon of January 6, and described his euphoria at the events. At around 1:30 p.m., while Milstreed was essentially engaged in battle on the West Plaza, he reported to Anne that "one of us" had been shot.[9] He told her, "We are gonna take the building[.] Shit is real. I feel so alive[.]" ECF 8, Exhibit

---

[9] Milstreed was in the immediate area where rioter Joshua Black was struck in the face with a less-than-lethal munition that lodged in his cheek and drew blood that later stained the ground. *United States v. Black*, 21-cr-127 (ABJ).  Based on the trial evidence elicited in that case, Black was struck at approximately 1:07 p.m.

23. To Facebook friend Chuck, he reported, "Getting ready to take the building[.]" ECF 8, Exhibit 24. He sent photos of blood on the floor in what appears to be the Upper West Plaza and then later added, "Man I've never seen anything like this . I feel so alive." *Id*. at 8. That evening, at around 5:00 p.m., Milstreed messaged Facebook friend Lisa, "We fucked them federal cops up. They all ran when we got physical. LMFAO[.]" He then added—*after* the riot on January 6 had ended— "Time for war." ECF 8, Exhibit 25.

### Milstreed's Celebration After the January 6 Riot

Milstreed's experience at the Capitol only seems to have heightened his resolve for violence and civil war, and he repeatedly boasted to friends about his acts of violence during the riot that day. In particular, as discussed below, he congratulated himself for his assault on the cameraman, claiming several times that it was "worth it" even if he might get it trouble as a result.

In the early morning hours of January 7, 2021, Milstreed told Facebook friend Thelma, "I'm home what a blast. We got there [sic] attention. Those federal cops were no match for angry Americans[.]" ECF 8, Exhibit 27. When Thelma lamented the violence, Milstreed responded, "This is beyond peace[.]" *Id.*   That night he also sent a text to a friend, Pat, with a hint of reflection about the gravity of his crimes, though he immediately offered a justification: "I understand this morning we may have been too aggressive.   But anger fear is a force of power.   These people in that building need to know we mean business[.]"

On January 8, Milstreed touted his assault when he told his Facebook friend Randy, "I did get to punch a camera man with everything I had brother I felt good." ECF 8, Exhibit 28. He sent a copy of video he took at the riot which showed Joshua Black, another rioter, who had been hit with a less-than-lethal round by the police and was bleeding from the cheek. Milstreed told Randy, Watch till the end[.]" He said, "brother war will.make u feel so alive." *Id.*

Three days after the riot, on January 9, 2021, Milstreed messaged Chuck to describe his participation in the violence and his intention to "crack some heads" while he was there, as follows:

| | |
|---|---|
| **Author** | Rodney Milstreed (Facebook: 100007297448244) |
| **Sent** | 2021-01-09 12:34:32 UTC |
| **Body** | Anybody thats thinks I went to D.C. and was gonna start there with a sign is just foolish . I went witha 4 ft club and intended to crack some heads . I'm not ever sorry some got hurt , could have been me . My only intentions were to drag these fucking criminals onto constitution blvd  and pound their head in. 🔨🔨 Fact. I'm surrounded by a bunch of pantie waste people with mouths and no action . This aint over these fucks will go down. FACT. |
| **Author** | Rodney Milstreed (Facebook: 100007297448244) |
| **Sent** | 2021-01-09 12:43:42 UTC |
| **Body** | I make a charge for punching the camera guy but it was worth it. Hit him with everything god give. The crowd cheered. 😂😂 |

ECF 8, Exhibit 29. He made a slew of similar comments to various friends that day. To Anne, he stated, "When I went to DC I didn't go there to be peaceful. In dont think most us wanted any damage. We want to get our hands on the politicians. We want to drag them in the street and put the fear of God in their soul. 💯 FACT." ECF 8, Exhibit 30. To his friend Jerry, Milstreed boasted, "I didn't go to be peace Jerry I took a 4 ft club and was looking to crack some skulls[.] I wanted to drag these fucks on constitution blvd and put the fear of God in them." He added, "People want blood and I'm one of them… We are at war, its just cold at the moment." ECF 8, Exhibit 31. To his Facebook friend Edward, he reported, "I punched a camera man with everything God gave me." ECF 8, Exhibit 32, at 5. He sent video of the riot, and a string of impassioned remarks:

> Anybody that thinks I went to hold a sign and say stop the steal is foolish .
>
> I went to crack some heads
>
> I think it is time for the use of the 2nd amendment for what it was designed for

> These fucks need to be dragged out on construction [sic] blvd and hung.
>
> I'm not ever sorry people got hurt .
>
> Could have been me
>
> This is what happens in time of war
>
> Martial Law needs to be in acted [sic]

*Id.* at 6. When Edward told Milstreed that he hadn't gone to the Capitol on January 6, Milstreed chided him, "Get your gun and enact the amendment. Talk is cheat [sic] and gets nothing done its worthless and meaningless to talk…" He bragged, "I took a 4 ft club with me. They knew I wasn't taking any shit. Very lucky I didn't get shot." *Id.* at 7.

Milstreed sent several of his Facebook friends selfies, pictures, and video he took at the Capitol. In some of these photos, Milstreed highlighted the blood he saw there, shown below:



*See, e.g.,* ECF 8, Exhibit 24 at 8. On January 10, 2021, Milstreed reported to his Facebook friend Jeremy that he was at the Capitol "front and center" and described the event as "Very violent[.]" ECF 8, Exhibit 33, at 5. He echoed his earlier comments: "I didn't go to make peace or hold a sign

lol. I wanted these fucks on constitution bvld and smash their heads[.] 🧨 I took a 4 ft club[.]" He claimed "Obama clintons gonna die[.] Bush also[.] Can't wait ." *Id.* at 5-6.

Also on January 10, 2021, Milstreed sent a series of photos and videos to Facebook friend Lanny, and again described his position at the riot as "front and center. We wanted to drag these criminals onto constitution blvd. Then pound there [sic] heads in." He referred to Democrats as "the enemy" and predicted, "There all going down that's they are criminal. You will soon learn. New is evil[.]" When Lanny said he was worried about Milstreed, Milstreed reassured him, "Couldn't be better[.] I feel so alive. Big history coming[.]" ECF 8, Exhibit 34.

### *Milstreed's Arrest, Search, and Weapons*

Milstreed was arrested on May 24, 2022, in Colorado, where he was working. Simultaneous with his arrest, agents executed court-authorized searches of his Maryland home and his Colorado hotel room. In Milstreed's hotel room in Colorado, agents discovered approximately 94 vials of a liquid substance they believe to be illegal injectable steroids. In Maryland, agents discovered the blue hat and camouflage hoodie Milstreed was wearing on January 6, 2021.

The Maryland search team also uncovered Milstreed's trove of weapons—some of the same weapons he described and displayed for his Facebook friends in the weeks surrounding January 6, as described above. Milstreed's firearms cache was not locked away for safekeeping, but was strewn out on a bed, much as he had photographed the firearms a year earlier. There were few serial numbers on any of the weapons. Moreover, agents found no indication that any of these weapons is registered to Milstreed in Maryland police databases. In sum, the firearms agents found at Milstreed's home included the following:

- AR Style Weapon; No Bolt Carrier Group, along with two attached Scopes ('Micro3x' and 'Strikeforce')
- Upper Receiver for AR Style Weapon; No Bolt Carrier Group

- Upper Receiver for AR Style Weapon with Bolt Carrier Group, along with a Scope and a Suppressor
- Upper Receiver for AR Style Weapon; No Bolt Carrier Group, along with a mounted Optic and a Suppressor
- 2 Lower Receivers for AR Style Weapons (one black, one silver)
- AR Style Weapon Scope, Black In Color ; Bearing 4-16x50aoeg
- Improvised Suppressor (Black in Color) With Inscription 'D2037963705'
- 2 Buffer Springs
- Upper Receiver for AR Style Weapon, No Bolt Carrier Group
- Unopened Box Labeled "Federal Ammunition .223 X 1000"
- Metal Ammo Box Partially Opened Containing Boxes of "Wolf Military Classic" .223 Rounds.
- Unopened Ammo Box Labeled Wolf Military Classic
- Box Containing (19) X 223. Rounds (20 Boxes), X 1 Winchester 556 (20 Rd Box)
- Opened Ammo Box Labeled "UMC Bulk Pack" Containing Approximately (471) .223 Rounds
- 11 Magazines Total: 9 X 5.56, 2 X 7.62, 7 X 30 Round Capacity, (1) Empty, (1) With (2) Rounds, (3) With 30 Rounds, (2) With 31 Rounds, 2 40 Round Capacity, (1) With 10 Rounds, (1) With 11 Rounds, Additional 3 Loose Rounds
- Remington Box Containing an Empty Magazine, 4 Shell Casings, 2 Live Rounds

One of the firearms listed above was a .300 Blackout caliber rifle (AR 15-variant) with a barrel length of 10.19 inches that was a privately made firearm with an upper receiver manufactured by Aero Precision and a lower receiver with a manufacturer that could not be determined. This firearm was not registered to Milstreed in the National Firearms Registration and Transfer Record as required, and in violation of federal firearms law. In addition, among the firearms listed above and in Milstreed's possession were two lower receivers and three upper receivers, all without serial numbers; three suppressors, including one that appeared to be hand-made; four assault rifle-style scopes, only one of which had a serial number; a mounted weapon optic; two buffer springs; approximately 2,000 to 2,500 rounds of ammunition; and 11 rifle-style magazines.

### *Milstreed's Interview Statements*

On May 24, 2022, after FBI agents placed Milstreed in custody and advised him of his rights, he agreed to an interview. Milstreed downplayed his thirst for violence and his participation in the riot on January 6, 2021. He said that he was unhappy with the results of the 2020 Presidential election. After hearing about the rally scheduled for January 6, 2021, he made plans to attend. He told agents he brought a flag attached to a shovel handle, which he claimed to have found at his home. He denied that he had any intention to engage in violence at the rally—though later in the interview, he acknowledged that he brought the shovel handle in case he encountered rowdy or violent counter-protestors with BLM. He claimed—contrary to any known evidence, and contrary to the video evidence—that a law enforcement officer confiscated his flag and the wooden handle while he was on the Capitol grounds. He did not acknowledge his assault with the pole until after agents confronted him with that information. Then, he minimized his behavior by describing his assault as simply the result of the heat of the moment. When asked about the smoke grenade, Milstreed denied throwing anything, and again only acknowledged his behavior after he was confronted with the fact that he was captured on video tossing the grenade. Then, he admitted only that he may or may not have done it.

In the interview, Milstreed admitted that the guns found at his Maryland home were indeed his. He reported that he kept them in the spare bedroom, and not in either of two safes he keeps on his property. He said he had shotguns, which he had owned since he was a child. (In fact, the agents in Maryland did not recover any shotguns.) He admitted that he owned an AR-15. When agents explained they had seen his Facebook comments about his weapons, he minimized again, claiming simply that he never intended to use them. He characterized his Facebook comments as idle talk.

### *Milstreed's Conversations from Jail*

While Milstreed was in custody, he talked about his actions at the Capitol in recorded phone conversations with his girlfriend.   On June 10, 2022, he complained about the consequences he might face in this case, when, as he put it, "all I did was go to a protest and act like an idiot."   He opined that "they're just making all us people that went to that Capitol pay—pay.   Pay for standing up against the government."   He suggested that the people who went to the Capitol on January 6 were just "standing up for the country they love" and that his prosecution was "disgusting."   In another call on June 15, 2022, although Milstreed acknowledged he was "probably not supposed to be talking about this over the telephone" because the call was being recorded, he suggested that the only thing he might be guilty of is trespassing, and that's it.   He claimed that at the Capitol there were 200,000 people ahead of him and he had to wait his turn to get up front.   He also claimed he did not know he was not supposed to be on the Capitol grounds.   He suggested that what the prosecution was doing to him was criminal.   Referring to the incident where Milstreed grabbed and yanked the bike rack from an MPD officer, he claimed that he was just "resting his arm on a bicycle rack, standing there watching."   He called the allegations "completely bogus."

When Milstreed and his girlfriend spoke again a few days later, on June 18, 2022, he insisted, "I didn't do anything different than 10,000 other people didn't do."   He claimed that he "protested, and that's it goddamn it," and insisted that the charges against him were made up and not true.   He referred to the events of January 6 as "a simple fucking protest."

### *Injuries*

Although the officer who was initially struck by Milstreed's club has not been identified, it recently was determined that Officer D.G. was a second officer struck and injured by Milstreed's assault on this line of USCP officers.   Milstreed's wooden club struck Officer D.G. in the head,

forcing him to seek medical treatment and removing him from the Capitol's line of defense.   On January 6, Officer D.G. was diagnosed with a concussion, and that diagnosis was confirmed at another facility the following day.   Even though Officer D.G. wore a helmet and other protective gear, Milstreed's assault was powerful enough to cause significant injury.   This is likely intentional; as noted above, Milstreed embarked on a program of steroid use and physical conditioning specifically to ready himself for "war" on January 6, 2021.   Officer D.G. suffered the effects of Milstreed's preparations for battle.

## III.    THE CHARGES AND PLEA AGREEMENT

On June 1, 2022, a federal grand jury returned an indictment charging Milstreed with 11 counts.[10]   On April 11, 2023, after the parties reached a plea agreement, Milstreed was charged by information with three counts: Assaulting Federal Officers, in violation of 18 U.S.C. § 111(a) and (b) (Count One); Assault, in violation of 18 U.S.C. § 113(a)(4) (Count Two); and Possession of an Unregistered Firearm, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871 (Count Three). On April 14, 2023, Milstreed was convicted of those offenses based on a guilty plea entered pursuant to a plea agreement.

---

[10] Specifically, Milstreed was charged with Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C § 1512(c)(2) and 2 (Count Two); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 USC §111(a)(1) and (b) (Counts Three and Four); Assault by Striking, Beating, and Wounding Within the Territorial Jurisdiction of the United States, in violation of 18 U.S.C. § 1123(a)(4) (Count Five); Simple Assault Within the Territorial Jurisdiction of the United States, in violation of 18 U.S.C. § 112(a)(5) (Count Six); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count Seven); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. 1752(a)(2) and (b)(1)(A) (Count Eight); Engaging in Physical Violence a Restricted Building or Grounds with a deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Count Nine): Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Ten); and Act of Physical Violence on the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Eleven).

## IV.   STATUTORY PENALTIES

Milstreed now faces sentencing on all three counts in the information. As noted in the plea agreement and the Presentence Report issued by the U.S. Probation Office, he faces up to 20 years of imprisonment, supervised release of up to 3 years, and a fine up to $250,000 on Count One; up to one year of imprisonment, supervised release of up to one year, and a fine up to $100,000 on Count Two; and up to 10 years of imprisonment, supervised release of up to 3 years, and a fine up to $10,000 on Count Three.   In addition, he faces the mandatory special assessment for each count, and forfeiture of all the property identified in the forfeiture allegation in the information and plea agreement.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

In the plea agreement, the parties agree that the following Guidelines apply in this case.

Count One: 18 U.S.C. § 111(a)(1) and (b) (assault on USCP officers)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon Used | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under § 111(b) | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | Sub-total | 26 |

Count Two: 18 U.S.C. § 113(a)(4) (assault on AP photographer)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.3 | Base Offense Level | 7 |
| | Sub-total | 7 |

Count Three, 26 U.S.C. § 5861(d) (possession of unregistered firearm)

| | | |
|---|---|---|
| U.S.S.G. § 2K2.1(a)(5) | Base Offense Level | 18 |
| | Sub-total | 18 |

Combined Offense Level:

|  |  |  |  |
|---|---|---|---|
| U.S.S.G. § 3D1.4(a) | Count One Group – one Unit | |  |
| U.S.S.G. § 3D1.4(c) | Count Two Group is Disregarded | |  |
| U.S.S.G. § 3D1.4(b) | Count Three Group – one-half Unit | | +1 |

Upward Departure

|  |  |  |  |
|---|---|---|---|
| U.S.S.G. § 3A1.4, note 4 | Offense Calculated to Affect the Conduct Affect the Conduct of Gov't | | +2 |

|  |  |
|---|---|
| **Total** | **29** |
| **Combined Offense Level** | **29** |
| Acceptance of responsibility (U.S.S.G. § 3E1.1) | <u>-3</u> |
| **Total Adjusted Offense Level:** | **26** |

*See* Plea Agreement at ¶¶ 5(A).

The Guidelines calculation here should also reflect the fact that Milstreed's offense was calculated to influence and affect the conduct of government by intimidation and coercion, and to retaliate against government conduct. U.S.S.G. § 3A1.4, cmt. n.4(A). Although the Probation Officer agreed that an upward adjustment on these grounds was warranted, Draft PSR at ⚑ 172, and the parties have agreed to this Guidelines application in the plea agreement, ECF 30 at 4, the PSR "defers to the Court to determine the extent of the adjustment."   Draft PSR at ⚑ 172. The government and the defense have agreed that a two-level upward departure is warranted in this case. ECF 30 at pp. 4, 5.

By Milstreed's own admission to this Court and other statements recounted above, his conduct was calculated for these ends. He began preparing for violence at the Capitol weeks before January 6 arrived, readying his supply of weapons, his friend group, and even his body for battle. His intent when participating in the violent riot that day was to stop the elected officials and other government personnel in Congress from certifying the results of the 2020 Presidential election,

and his means of achieving that goal was intimidation and coercion. *See* Plea Agreement, ECF 31, at 5. As Milstreed put it—even after he had several days to reflect on what he acknowledged was a "very violent" event— "I didn't go to make peace or hold a sign lol. I wanted these fucks on constitution bvld and smash their heads[.]" ECF 8, Exhibit 33. In his efforts to recruit like-minded people to his cause, he shared pictures of his hefty cache of weapons, suggesting that if he did not get his preferred outcome there would be "civil war" and "alot of dead bodies." ECF 31, at 5.   An upward departure, as contemplated under U.S.S.G. § 3A1.4 Commentary, Application Note 4(A), is necessary here to fully account for the seriousness of Milstreed's conduct and his effort to intimidate and coerce in order to force the government to act according to his wishes, and retaliate when it did not.   As he confirmed just days after January 6, "My only intentions were to drag these fucking criminals onto constitution blvd and pound their head in."   ECF 8, Exhibit 29.

The U.S. Probation Office calculated Milstreed's criminal history as category I, which is not disputed. Draft PSR ¶ 80. Accordingly, based on the government's calculation of Milstreed's total adjusted offense level, after acceptance of responsibility, at 26, Milstreed's Guidelines imprisonment range is 63 to 78 months' imprisonment. Milstreed's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Milstreed's violent conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United

States into a Constitutional crisis. Milstreed engaged in weeks of planning for the violence, conditioning his body with steroids and workouts so that he could better physically attack his opponents and amassing weapons and ammunition he broadcast to threaten and intimidate. When January 6 finally arrived, Milstreed made good on those intentions, attacking the police and the media as he joined the effort to block Congress from performing its work that day. The nature and circumstances of Milstreed's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 78 months in custody.

### B.  The History and Characteristics of the Defendant

Milstreed has a criminal history that includes a history of drug use and a prior arrest for distribution of cocaine. While his criminal history is dated, it spanned more than 20 years, indicating that Milstreed may not have but his criminal past entirely behind him on January 6, 2021, when he committed these offenses. Moreover, in addition to prior convictions for possession of a controlled substance and possession with intent to distribute, trespassing, and theft, Milstreed has five other arrests, the disposition of some of which are unknown, including for controlled substance offenses. Troublingly, Milstreed's 1987 conviction for possession with intent to distribute cocaine, which resulted in a suspended sentence of 3 years in custody, was a felony offense. Yet this did not dissuade him from owning, displaying, and threatening to use his "sleeping giant" armory that he had in his possession in the weeks leading up to January 6, 2021, and continuing until his 2022 arrest in this case.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Milstreed targeted the police officers on the West Front for the very reason that they were protecting the Capitol and the people working inside. ECF 31, at 4. His criminal conduct on

January 6 was the epitome of disrespect for the law.

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[11] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Milstreed has a criminal history category of I, he has a 20-year history of arrests and convictions for criminal conduct. *See* Section VI(B) *supra*. Second, although Milstreed has now accepted responsibility by pleading guilty, he has never expressed remorse or contrition. His social media statements after January 6 were those of a man girding for another battle and "civil war." And in his post-arrest interview with the FBI, he reluctantly acknowledged only the evidence he was confronted with on video, and only after the interviewing agents directed him to those very videos. Even then, he acknowledged merely that he might have (or might not have) thrown the smoke grenade at the police.   And in the weeks following his arrest, in conversations with his girlfriend, Milstreed downplayed and denied his actions, and decried his prosecution as unfair. Milstreed's sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his violent rhetoric simultaneous to his unlawful

---

[11]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

possession of firearms.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the

Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[12]

---

[12] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[13]

While every case will necessarily involve different mitigating and aggravating circumstances and slightly different facts, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case:

Guy Reffitt, the first January 6 rioter to be tried by a jury, was convicted of multiple felony offenses, including 18 U.S.C. § 1512. *United States v. Guy Wesley Reffitt*, 21-cr-32 (DLF). Explaining his motives in participating in the riot, Reffitt used remarkably similar language to that used by Milstreed: he wanted to "take Congress" and "rip every one of them, Republican, Democrat, the fuck out of there[.]  *Id.*, Sentencing Memo., ECF 158, at 11. Like Milstreed, who talked about dragging politicians out of the building and smashing their heads, Reffitt said he wanted "to see Pelosi's head hit every fucking stair on the way out." *Id.* Yet on January 6, unlike Mistreed, Reffitt did not personally engage in violent acts against officers. While Reffitt was not charged with a firearm offense, the government adduced evidence at sentencing that Reffitt was armed with a loaded firearm at the U.S. Capitol. *Id.* at 14. While Mistreed was charged with a weapons offense, he did not bring his weapons to the Capitol on January 6, but he had them at the ready at his nearby home—even though in his case, his mere possession of some of that armory was itself unlawful. Unlike Reffitt, Milstreed has accepted responsibility and his Guidelines should

---

[13] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

be reduced accordingly. But also unlike Reffitt, Milstreed not only planned for and encouraged the crowd to commit violence—he himself attacked the police and the media, using a deadly and dangerous weapon to do so. Reffitt faced a guideline range of 87 to 108 months' incarceration, and the court sentenced him to 87 months' incarceration. A sentence of 78 months for Milstreed— less than that imposed on Reffitt—is appropriate here, where Milstreed actually made good on his threats and committed numerous acts of violence on January 6.

In *United States v. Andrew Mazza*, 21-cr-736 (JEB), the defendant, like Milstreed, was prosecuted for his violent acts against the police on January 6, 2021, and for related firearms offenses in violation of District of Columbia law. Although Mazza initially obstructed the investigation by filing a false police report to conceal the truth of his lost firearm and gave false information to USCP Special Agents, he eventually pled guilty and accepted responsibility. Mazza faced a sentencing guidelines range of 57 to 71 months' incarceration, and this Court sentenced him to 60 months in custody. Milstreed's sentence should be higher, to account for his significantly more violent rhetoric and methodical preparation leading up to January 6, his additional assault on a member of the media, and the fact that his behavior was calculated to influence the conduct of government through intimidation and coercion.

In *United States v. Khater*, 21-cr-222 (TFH), the defendant pled guilty to two counts of assaulting federal officers using a deadly or dangerous weapon, as a result of his assault on police on the West front using chemical spray. Different from Milstreed, there was no evidence that Khater planned ahead for the violence; instead, it seemed Khater was responding to having been sprayed himself. *Id.*, Sentencing Memo., ECF 97 at 14.  But unlike Milstreed, he was not charged with the simultaneous unlawful possession of firearms, nor did he engage in a separate hands-on assault of a member of the media.  Khater faced a guidelines sentencing range of 78 to

97 months' incarceration, and the court sentenced him to 80 months in custody. A sentence of 78 months for Milstreed is appropriate here, where Milstreed engaged in more violent behavior and called his fellow rioters to action throughout the day.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[14] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Milstreed must pay $2,000 in restitution, which reflects in part the role he played in the riot on January 6.[15] Plea Agreement at ¶ 12. As the plea agreement

---

[14] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, Papagno, 639 F.3d at 1096, also applies here since the offenses of conviction include assault on federal officers using a deadly or dangerous weapon. *See* 18 U.S.C. § 3663A(c)(1).

[15] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of the date of the plea. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Milstreed's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* Draft PSR ¶ 169.

As noted above, Officer D.G. reported suffering a concussion requiring medical care as a result of Milstreed's assault.   At this time, the Government does not have sufficient information to request restitution for this victim, but will supplement this Memorandum as appropriate.

## VIII.   FORFEITURE

As set forth in the Plea Agreement, Milstreed agreed to forfeiture of the specific property set out in that agreement, the Information, and in the Consent Order of Forfeiture. ECF 32. The Court determined that specific property was subject to forfeiture pursuant to 18 U.S.C. § 924(d), 26 U.S.C. § 5872, and 28 U.S.C. § 2461(c). That property remains in the possession of the FBI. The government requests that this Court make the Consent Order of Forfeiture part of the sentence and included in the judgment in this case.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 78 months' incarceration, three years' supervised release, a $210 special assessment,

and restitution in the amount of $2,000.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:    */s/ Emily W. Allen*
EMILY W. ALLEN, Cal. Bar No. 234961
Assistant United States Attorney
601 D Street N.W.
Washington, DC 200530
emily.allen@usdoj.gov