## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Criminal No. 1:22-cr-198-JEB** |
| ) | |
| **RODNEY KENNETH MILSTREED,** ) | |
| ) | |
| *Defendant.* ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

### I.    INTRODUCTION

Rodney Kenneth Milstreed, by and through undersigned counsel, respectfully files this Memorandum in Aid of Sentencing. Mr. Milstreed comes before this Court humbled, contrite, and extraordinarily remorseful for his actions which have brought him before it following his acceptance of responsibility upon entering a plea of guilty to: 1) Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(l) and (b); 2) Assault by Striking, Beating, or Wounding, in violation of 18 U.S.C. § 113(a)(4), and 3) Receipt and Possession of an Unregistered Firearm, in violation of 26 U.S.C. § 5861(d).

Based upon his personal history and characteristics, the nature and circumstances of the offense, his stale criminal history, his unlikelihood of recidivism, the need to avoid unwarranted sentencing disparities, and other mitigating circumstances, Mr. Milstreed respectfully requests that the Court impose a sentence of time served, as such a sentence would be "sufficient, but not greater than necessary," to achieve the legitimate purposes of sentencing. 18 U.S.C. § 3553(a).

## II.     RODNEY MILSTREED'S BACKGROUND

### A.     Family History

Rodney Milstreed is fifty-six (56) years old, and was born in Baltimore, MD to his parents Robert and Rosie Milstreed. *See* PSR at ¶ 90. Mr. Milstreed had a normal upbringing despite his parents divorcing when he was sixteen (16). *Id*. at ¶ 91. Following this life event, Mr. Milstreed stayed with his father but was responsible for providing for himself. *Id*. He soon dropped out of high school, and entered into a vocational program for machinists, an industry in which he has been employed successfully for over thirty (30) years. *Id*. Mr. Milstreed remains close with his father, who is over eighty (80) years old. *Id*. He also has a good relationship with his brother, Robert Milstreed, who also lives in Maryland. *Id*. at ¶ 93. Unfortunately, Mr. Milstreed's mother, with whom he had a rocky relationship throughout her life, passed away at age eighty-one (81) in 2020 from cancer and complications from COVID-19. *Id*. at ¶ 90. Thankfully, Mr. Milstreed's relationship with his mother improved as she aged. *Id*. at ¶ 92.

Mr. Milstreed was previously married and has one estranged daughter from a different relationship. *Id*. at ¶ 94, 97. He has been in a long-term relationship with Valerie Moorefield for the last ten (10) years, and she has remained extremely supportive throughout the pendency of this case, including assisting with caring for Mr. Milstreed's ailing and aging father. *Id*. at ¶ 96.

### B.     Education and Employment

Mr. Milstreed did not complete high school, but has not let his time incarcerated go to waste. In fact, while being held in Colorado, where he was initially arrested, Mr. Milstreed completed his General Educational Development (GED) in April, 2023. *Id*. at ¶ 111. He also has training as a turbine and valve technician. *Id*. at ¶ 112.

Mr. Milstreed has been employed in the machinist industry for most of his life, and prior to the instant offense, he was working as a machinist and valve technician, traveling across the country servicing oil and gas facilities. *Id*. at ¶ 114.

████    █████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████

## III.     THE LEGAL FRAMEWORK OF AN ADVISORY GUIDELINE RANGE

While this Court must still correctly calculate the guideline range, *see Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *see id.* at 51; *see also Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," *Gall*, 552 U.S. at 49-50, "make an individualized assessment based on the facts presented," *id.*, and explain how the facts relate to the purposes of sentencing. *See id*. at 53-60; *see also Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at 101; *Pepper*, 131 S. Ct. at 1242-43.

In order to ensure that the guidelines are truly advisory and constitutional, this Court has the authority to disagree with a guideline as a matter of policy. Because "the Guidelines are now

advisory . . ., as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (*citing Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

Additionally, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." *Pepper*, 131 S. Ct. at 1240 (citing *Wasman v. United States*, 468 U. S. 559, 564 (1984)).

In this regard, "the district court's job is not [even] to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." *United States v. Foreman*, 436 F.3d 638, 644, n.1 (6th Cir. 2006). Accordingly, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006).

## IV.    THE APPLICABLE U.S. SENTENCING GUIDELINES RANGE

According to the plea agreement in this matter, the following U.S. Sentencing Guidelines apply:

**2021 Guidelines**

**Count One, 18 U.S.C. § 111(a)(1) and (b)**

| | |
|---|---|
| U.S.S.G. § 2A2.2(a) – Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) – Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(7) – Convicted under Section 111(b) | +2 |
| U.S.S.G. § 3A1.2(b) – Official Victim | +6 |
| **Adjusted Offense Level (Subtotal)** | **26** |

**Count Two, 18 U.S.C. § 113(a)(4)**

| | |
|---|---|
| U.S.S.G. § 2A2.3 – Base Offense Level | 7 |
| **Adjusted Offense Level (Subtotal)** | **7** |

**Count Three, 26 U.S.C. § 5861(d)**

| | |
|---|---|
| U.S.S.G. § 2K2.1(a)(5) – Base Offense Level | 18 |
| **Adjusted Offense Level (Subtotal)** | **18** |

**Combined Offense Level**

| | | |
|---|---|---|
| U.S.S.G. § 3D1.4(a) | Count One Group – one Unit | |
| U.S.S.G. § 3D1.4(c) | Count Two Group is Disregarded | |
| U.S.S.G. § 3D1.4(b) | Count Three Group – one-half Unit | +1 |

**Upward Departure**

| | | |
|---|---|---|
| U.S.S.G. § 5K2.0 | §3A1.4, note 4, Offense Calculated to Affect the Conduct of Gov't | +2 |

| | |
|---|---|
| **Adjust Total Offense Level (Subtotal)** | **29** |
| U.S.S.G. § 3E1.1(a) – Acceptance of Responsibility | -2 |
| U.S.S.G. § 3E1.1(b) – Acceptance of Responsibility | -1 |
| | _____ |
| **Total Offense Level** | **26** |

*See* Plea Agreement.

As to Count Two, the Plea Agreement calculates the guidelines as an offense level seven (7) with no additional specific offense characteristics. The PSR calculates it as a level seventeen (17), with a base offense level of fourteen (14) and a bodily injury enhancement of three points. *See* PSR at ¶ 54-55. The PSR finds that the conduct constituted aggravated assault and increased the offense level because of those reasons. However, aggravated assault is a term of art that is defined in the U.S.S.G as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily harm (i.e. not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony." *See* U.S.S.G. 2A2.2. Simply put, none of the conduct described in the Statement of Offense meets the definition set forth of aggravated assault, and therefore the proper guidelines calculation should be a level seven (7) with no specific offense characteristic enhancement of bodily injury because there was no bodily injury. *Id*. *See also* PSR at ¶ 130 and 139.

Mr. Milstreed has a criminal history score of zero (0); he, therefore, has a Criminal History Category of I for sentencing purposes. *See* PSR at ¶ 80. Pursuant to the Plea Agreement, Mr. Milstreed's Total Offense Level of twenty-six (26), combined with a Criminal History Category of I produces a Guidelines' range of sixty-three (63) to seventy-eight (78) months. *Id*. at ¶ 17. However, the PSR calculates Mr. Milstreed's Total Offense Level of twenty-four (24); combined

with a Criminal History Category I, an advisory Guidelines' range of fifty-one (51) to sixty-three (63) months is produced. *Id*. at ¶ 130.

## V.      18 U.S.C. § 3553(a) FACTORS

As the Court is well aware, the Sentencing Guidelines are not mandatory, and while the Court must consult the Guidelines and take them into account at sentencing, *see United States v. Booker*, 125 S. Ct. 738, 767 (2005), Section 3553(a)(1) provides a "broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *Gall*, 552 U.S. at 50 n. 6. The command is consistent with the Supreme Court's observation that "the punishment should fit the offender and not merely the crime." *Pepper*, 131 S. Ct. at 1240 (citing *Williams v. New York*, 337 U.S. 241, 247 (1949)). It is similarly consistent with Congress' express directive that "[n]o limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct." *Id.* (citing 18 U.S.C. § 3661).

### A.      The Nature and Circumstances of the Offense

Mr. Milstreed's conduct and involvement in the instant offense is beyond regrettable. As he very plainly tells the Court, "I so deeply regret my lack of judgment and fully understand the wrongfulness of my actions … and agree that it was unlawful." *See* Exhibit A. He has been incarcerated for over fifteen (15) months and has absolutely "learned from [his] mistakes." *Id*. He now understands the gravitas of his "hateful" and "threatening" messages, his conduct, and the grander scheme of the events of January 6, 2021. *Id*. He explains that he came to Washington, D.C. that day to be a part of a rally and protest because he loves his country, and "had no idea" it was going to become the chaos that it did. *Id*. He further acknowledges that "if one has concerns or grievances with the government, there are peaceful and appropriate ways to express them." *Id*. Mr.

Milstreed is determined to "return to society" a "smarter person, citizen, and a better American." *Id*. He promises not only the Court, but the prosecutors, law enforcement, and the community, that he will never engage in conduct like this again. *Id*. Further, he has not wasted his time while incarcerated, not only earning his GED, but completing a construction industry course and a general industry (manufacturing) course. *See* Exhibit I.

### *Other Mitigating Circumstances*

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████

---

[1] Available at https://my.clevelandclinic.org/health/drugs/5521-anabolic-steroids

[REDACTED]

## B.      Rodney Milstreed's Personal History and Characteristics

Mr. Milstreed is loved and admired for his hard work and kindness towards others. *See* Exhibits B - H. His girlfriend of ten (10) years, Valerie Moorefield, writes about how he was there for her in the most trying times of life – after she lost her husband. *See* Exhibit B. Mr. Milstreed actually knew Ms. Moorefield's husband and they were long time friends before his passing. *Id*. She tells the story of how one time, he and Mr. Milstreed were out driving a sports car and the "car caught fire." *Id*. She tells the Court that "if [it] wasn't for Rodney being the[re] he most likely would not have survived." *Id*. She also tells how Mr. Milstreed saved a different friend from an overdose. *Id*. Ms. Moorefield and Mr. Milstreed's relationship has not been easy, particularly with

him having to travel for work so often, but they have always been 'able to do well with it and [compromise]." *Id*. She is so grateful to Mr. Milstreed for showing her to "move forward to love again." *Id*. She knows the charge for which he faces sentencing is serious and that Mr. Milstreed and herself have been humbled by this whole experience. *Id*. However, she remains confident that "it is highly unlikely he would violate the law in the future." *Id*.

Robert Milstreed is Mr. Milstreed's father, and he writes a strong letter of support for his son. *See* Exhibit C. Mr. Milstreed talks about how his son "always lived his life his way by being respectful and in helping other people," and that even though his son has erred as it relates to this offense, that Mr. Milstreed "feels horrible and very remorseful about it." *Id*. Mr. Milstreed's father regales about times raising his son, taking him on plumbing jobs with him, hunting, and taking him to carnival rides. *Id*. Mr. Milstreed knows that his son is "not who [the] government has made him out to be," and believes he was strongly influenced by social media and the events of that day. *Id*. He too believes it is not likely that his son will ever violate the law again, and believes in the goodness he instilled in his son. *Id*. Mr. Milstreed is eighty-four (84) years old and requires care, and Mr. Milstreed's incarceration has made it difficult for him to tend to his property and for other daily activities. *Id*. As he tells the Court, "[h]e is very much appreciated and needed back at home." *Id*.

These sentiments are echoed in Mr. Milstreed's brother, Robert Paul Milstreed's letter to the Court. *See* Exhibit D. Mr. Milstreed's brother "promises to mentor Rodney" and prays that he will be able to "enjoy the remaining time our dad has left to live and be about to help me take care of him." *Id*. He too, knows that Mr. Milstreed has learned a very important lesson because "to lose your freedom is para[mount]." *Id*.

10

Vanessa Bowers, Mr. Milstreed's longtime friend, further illustrates Mr. Milstreed's compassion and kindness towards others. *See* Exhibit E. She discusses Mr. Milstreed's interactions with her brother who "was bullied for being 'slow,'" and was befriended by Mr. Milstreed. *Id*. She recounts how he would always "wave to my brother" from the high school bus and how it "meant acceptance and friendship" to not only her brother, but to her. *Id*. Mr. Milstreed also became like family and was there for the family when Ms. Bower's father passed away almost 30 years ago. *Id*. She knows that Mr. Milstreed is "very remorseful and embarrassed by his actions" and has found this experience "very humbling." Ms. Bower talks about how Mr. Milstreed's worst mistake has been made public, and it is a shameful reality with which he will have to live for the remainder of his life. *Id*. Like others, she attributes social media and mass misinformation for partly causing his "poor judgment." *Id*.

Mr. Milstreed is not only loved by his family and friends, but is well respected and admired for his hard work and professionalism. Jason Garnet, one of the operations managers at Industrial Service Solutions, the company Mr. Milstreed has worked at for the past eight (8) years, writes that Mr. Milstreed is an "outstanding machinist, a critical thinker, a good man, and a friend." *See* Exhibit F. He tells the Court how Mr. Milstreed is an "unbelievably valuable" member of their team and how the organization "sorely miss[es]" him. *Id*. One of the other branch managers, Glenn Stephenson, describes Mr. Milstreed as "courteous and respectful" in all his dealings with the company, and that he has "earned the trust and confidence of coworkers, management, and facilities team members." *See* Exhibit G. He too discusses how the organization misses Mr. Milstreed's talent and quality. *Id*. In plain words, Brandon Johnson, another friend and coworker, tells the Court that it would simply "not be [a] mistake to return him to society in any way." *See* Exhibit H.

In sum, Rodney Milstreed is beloved by his family, friends, and coworkers. All who are close to him believe in his goodness, and that this lapse of judgment is not indicative of how he has lived his life. Further, everyone is confident that he will never again be before the Court, and they cannot wait for his return.

### C.      Mr. Milstreed's Poses Little Risk of Recidivism

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured. Fortunately, Mr. Milstreed does not fit the archetype of a person who will commit new criminal offenses or recidivate. And, because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that take such research into consideration to impose more effectively sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Commission's own findings that "[t]here is no correlation between recidivism and Guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected, as the Guidelines' offense level has long been recognized as "[n]ot intended or designed to predict recidivism." *U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*). Thus, the Guidelines are at odds with 18 U.S.C. § 3553(a)(2)(C). Accordingly, *Booker*, 125 S. Ct. 738, has freed the judiciary to remedy this inconsistency.

In addition to what has already been described about Mr. Milstreed's character demonstrating his ability to reform, the Commission has also objectively quantified his low likelihood of recidivism. For example, the Sentencing Commission's study confirms that

recidivism rates decline relatively consistently as age increases. *See Measuring Recidivism* at 12. More specifically, with respect to Mr. Milstreed, who is fifty-six (56) years old, defendants over the age of fifty (50) with no criminal history points have a recidivism rate of only six-point-two percent (6.2%). *Id.* at 28. There is, quite simply, nothing in the record to make this Court reasonably believe that Mr. Milstreed would commit any criminal offense in the future.

It is unfortunate that the Guidelines' offense levels do not take into consideration such data. Such data exists yet is not utilized to inform the Commission's rulemaking. However, without even considering the circumstances of the offense, it is apparent that Mr. Milstreed is not a person who is statistically likely to recidivate. And, when one considers such statistics in light of Mr. Milstreed's personal history and characteristics, it is safe to assume that he will never again be arrested or charged with an offense.

### D.  The Need to Avoid Unwarranted Sentencing Disparities

A factor that has become especially important in January 6 cases  is the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). . Despite its best efforts, the government has been inconsistent with its plea offers and sentencing recommendations for similarly situated January 6 defendants. It is Mr. Milstreed's position that sentences should not drastically vary simply because of the discrepancy in plea offers.

For example, in *United States v. Mikhael Slye*, 22-cr-334-JEB,  the offense conduct was either on par or more egregious than Mr. Milstreed's and the defendant was allowed to plead to only 18 U.S.C. § 111(a).  This is significant because of the two-level guideline enhancement that automatically applies with a plea to 18 U.S.C. § 111(b). Accordingly, treatment of similarly situated defendants supports  the request for the Court to impose a sentence of time served.

13

This Court is well versed in the now nearly seventy (70) page chart comparing the sentences of all January 6 defendants.[2] For sake of brevity and to focus the Court's attention, Mr. Milstreed asks the Court to consider three (3) cases in which this Court already imposed sentences. Each contains important facts that distinguish Mr. Milstreed's conduct and support a sentence of time served.

In *United States v. Mazza*, the defendant pleaded guilty to the same 111(a) and (b) charge as Mr. Milstreed, and an additional concealed weapons charge. *See* 21-cr-736-JEB. In Mr. Mazza's case, he brought a loaded .45 caliber Taurus revolver capable of shooting both bullets and shotgun shells to Washington, D.C. from Indiana, and carried it with him – concealed – during the events of January 6, 2021. *Id*. at Dkt. No. 25. Mr. Mazza engaged in serious combative efforts in a tunnel near the West Front Terrace, took control of a baton from an officer, and used it to strike him and other officers. *Id*. After the events of January 6, 2021, Mr. Mazza returned to Indiana without his weapon but with the stolen baton, from which he removed the serial number. *Id*. He then falsely reported his weapon stolen from a casino in Ohio, knowing he has lost it during the events of January 6, 2021. *Id*. Mr. Mazza also lied to law enforcement about ever being violent on January 6, 2021. *Id*. Mr. Mazza's sentencing guidelines resulted in an offense level of 25, a criminal history category I, and a guideline range of 57 to 71 months of incarceration. *Id*. at Dkt. No. 24. The government asked for 78 months – the Court imposed 60 months of incarceration.

In *United States v. Jacob Therres*, the defendant pleaded guilty to the same 111(a) and (b) charge as Mr. Milstreed. *See* 21-cr-381-JEB. Additionally, Mr. Therres was at the West Plaza of the Capitol when he threw a 4x4 wooden plank at the police line, hitting an officer on the helmet. *Id*. at Dkt. No. 30. The hit was so severe that the officer briefly lost consciousness and experienced

---

[2] Available at https://www.justice.gov/usao-dc/capitol-breachcases.

concussion symptoms after January 6. Mr. Therres then took chemical spray and sprayed officers from the inaugural stage. *Id.* Mr. Therres sentencing guidelines resulted in an offense level of 26, a criminal history category II, and a guideline range of 70-87 months of incarceration. *Id.* at Dkt. No. 29. The government asked for 84 months – the Court imposed 40 months of incarceration.

In *United States v. Mikhael Slye*, the defendant received the benefit of and only pleaded guilty to one count of 111(a), which did not include the automatic two (2) level enhancement for a 111(b) conviction. *See* 22-cr-334-JEB. Mr. Slye actually entered the Capitol for over thirty (30) minutes, then exited, held onto a bike rack, waited for officers to come down the stairs, and then threw the bike rack at them. *Id.* at Dkt. No. 29. One of the officers tripped over the bike rack and fell down the stairs at the same time, sustaining injuries to his right hand, shins, and a contusion to his thumb. *Id.* Mr. Slye also spat at officers. *Id.* Mr. Slye's sentencing guidelines resulted in an offense level of 24, a criminal history category I, and a guideline range of 51 to 63 months of incarceration. *Id.* at Dkt. No. 28. The government asked for 57 months – the Court imposed 30 months of incarceration.

While in no way excusing Mr. Milstreed's conduct, it is imperative for the Court to consider the stark differences in the cited examples, which further support Mr. Milstreed's request for a sentence of time served. Unlike Mr. Mazza, Mr. Milstreed did not bring any of the weapons or ammunition he owned to Washington, D.C, did not steal any weapons from any officers, did not file a false police report, and did not lie to federal investigators about being involved in violent conduct on January 6. Unlike Mr. Therres, Mr. Milstreed's assaultive conduct of throwing a wooden pick handle that glanced off the officer's helmet did not knock the officer unconscious and cause concussive symptoms – in fact, there is no evidence it caused any injury to the officer at all. And unlike Mr. Slye, Mr. Milstreed's conduct in grabbing a bike rack did not include

throwing it at officers, making an officer fall down the stairs, and causing that same officer injuries; nor did Mr. Milstreed spit at any officers.

***Dangerous Weapon Enhancement***

Since Mr. Milstreed has pleaded guilty, at least one (1) court declined to apply the dangerous weapon enhancement provided in U.S.S.G. § 2A2.2(b)(2)(B) where the defendant used a flagpole, *see United States v. Hernandez*, No. 1:22-cr-42-CRC, or similar object, *see United States v. Wilson*, No. 1:21-cr-345-RCL (declining to apply the enhancement where the defendant struck two (2) officers with a PVC pipe), to effectuate the charged assault. It would be appropriate here for the Court to decline to apply or otherwise give any weight to the dangerous weapon enhancement in Mr. Milstreed's case, as he used a wooden pick handle carrying a Trump flag on it. *See* PSR at ¶ 30.

### E.  Mr. Milstreed's Public Demise is Adequate Deterrence to Others

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct." Arguably, the government has already substantially achieved the maximal deterrent effect of Mr. Milstreed's offense simply by charging and convicting him. As a result, Mr. Milstreed's name and the substance of his offense will be discussed in numerous conversations and settings among family, friends, and the community for years to come, a disheartening reality from which he simply cannot escape. In short, Mr. Milstreed's public demise sends a strong message to anyone foolish enough to engage in similar offenses.

### VI.    CONCLUSION

In light of the above, Rodney Milstreed respectfully requests that the Court impose a sentence of time served.

16

Respectfully submitted,

_____/s/_____
David Benowitz
D.C. Bar No. 451557
Rammy G. Barbari
D.C. Bar No. 1032106
Price Benowitz, LLP
409 7th Street, NW, Suite 200
Washington, D.C. 20004
(202) 417-6000
David@PriceBenowitz.com
Rammy@pricebenowitz.com

*Counsel for Rodney Milstreed*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 15th day of September 2023, I caused a true and correct copy of the foregoing Defendant's Memorandum In Aid of Sentencing to be delivered via CM/ECF to all parties in this matter.


_____/s/_____
David Benowitz
Rammy G. Barbari